

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-16-779

| | | |
|---|---|---|
| JACOB LOUTON | APPELLANT | Opinion Delivered: April 12, 2017 |
| | | APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. 26JV-14-650] |
| V. | | |
| AUDRA DULANEY | APPELLEE | HONORABLE STEPHEN CHOATE, JUDGE |
| | | AFFIRMED IN PART; REVERSED AND REMANDED IN PART |

## BART F. VIRDEN, Judge

Appellant Jacob Louton appeals from an order by the Garland County Circuit Court awarding custody of his son, KL (DOB: 11-26-2012), to appellee Audra Dulaney, the child's mother, and ordering him to pay monthly child support of $1,000. He raises two points on appeal: (1) the trial court erred in awarding custody to Dulaney without considering joint custody, and (2) the trial court erred in imputing income to him and setting child support based on that amount. We affirm the custody decision but reverse and remand on the issue of child support.

## I. *Procedural History*

This case began on September 12, 2014, when Ann Leach, Dulaney's mother, filed a Family in Need of Services (FINS) petition seeking temporary custody of one of Dulaney's other children because Dulaney was then in treatment for a drug addiction. On September

24, 2014, the trial court placed custody of that other child with her maternal grandparents and ordered Louton to be served with an order to appear with KL at a hearing in October 2014, which was continued until November. A paternity report was filed on November 25, 2014, indicating that Louton was KL's biological father. Louton was awarded temporary custody of KL in an order entered in January 2015.

On April 23, 2015, Dulaney moved for KL to be returned to her custody, alleging that she had been sober for at least six months, was attending NA meetings, and had secured stable housing and employment. Alternatively, Dulaney sought visitation with KL because Louton had refused to allow her any visits with the child. A hearing was held later that month, and Louton failed to appear. The trial court returned custody of KL to Dulaney. In June 2015, the trial court ordered the parties to alternate visitation with KL until the case was resolved. Through mediation, the parties agreed to a different visitation schedule with respect to KL, but they refused to cooperate with each other. A hearing was held in December 2015 to establish custody and support.[1]

## II.  *Hearing*

The evidence established that Louton and Dulaney were married briefly in 2007. According to Dulaney, their marriage ended when she filed domestic-violence charges against Louton and got a no-contact order. KL was conceived and born out of wedlock to the parties in 2012. Dulaney testified that shortly after KL's birth Louton had requested a DNA test, which confirmed that he was KL's father. Dulaney stated that Louton, who had

---

[1]In November 2015, custody of Dulaney's older daughter, who had been residing with her maternal grandparents, was returned to Dulaney by consent order.

moved to Colorado, visited only twice after KL was born and provided her with a small amount of money.

Dulaney testified that she had been diagnosed with bipolar disorder as a teenager and took medication for that. She admitted having an opiate addiction in 2008. While pregnant with KL, Dulaney was diagnosed with both cervical and uterine cancer, ultimately requiring that she have "a radical hysterectomy." Dulaney said that she had cut her wrists while pregnant with KL and had been hospitalized for five days. Dulaney said that her family had offered some help but that Louton had offered her no help. Dulaney explained that she was a single mother raising five small children aged ten, six, four (twins), and three (KL). Dulaney testified that she felt "helpless" and thought that she was "failing at being a mom," so she started using drugs to give her energy. She admitted "shooting up" with methamphetamine for six months before the FINS petition was filed.

She stated that the Arkansas Department of Human Services (DHS) became involved due to her drug abuse but did not remove KL from the home. During DHS's involvement, Dulaney asked a social worker for help finding a drug-rehab facility. The social worker advised her that she could not keep her children, which Dulaney said led her to ask Louton to take temporary custody of then eighteen-month-old KL. She saw that as "her only option." Dulaney went to two drug-rehab facilities while Louton had KL. Dulaney testified that, during the eight or nine months that Louton had custody of KL, he did not allow her to see the child, even after she had been awarded visitation.

She said that after custody of KL had been returned to her, Louton and the child spoke on the telephone almost every day. Dulaney said that on one occasion when KL

returned from visitation with Louton, he had been bitten by Louton's dog; there were two or three times when KL's hair, shoes, and clothing smelled like marijuana; she thought Louton was growing marijuana in his basement; she did not think KL had been taken to the doctor and dentist for checkups; and the boy was very withdrawn and quiet since he had been returned to her custody. According to Dulaney, Louton did not return the child on time and sometimes arrived with him after midnight. Dulaney stated that she and Louton did not communicate effectively at all.

Dulaney testified that she lives in a three-bedroom, two-bath house and that all of KL's siblings and extended family, as well as Louton's child from another relationship, also live in Garland County. Dulaney admitted that she had been fired from her last job but stated that she had been working at a new job for three weeks, earning $300 per week. Also, she was in the military in 2003 but had been discharged due to a back injury, for which she received VA and SSI disability.

Dulaney further testified that she had been sober for fourteen months, attended NA/AA meetings five times per week, and attended "Celebrate Recovery" meetings twice per week. She said that she gets along well with her family, as well as Louton's family, and that she also has an "accountability team" and a church family.

Ann Leach, Dulaney's mother, testified that Dulaney had been angry with her because she had called DHS and reported that Dulaney's children were not living in a safe environment. She said that she and her daughter had no contact for three months but that they are very close currently. Leach stated that Dulaney had always been a good mother and that she believed that Dulaney's drug problem had been triggered by her surgery. She further

testified that Dulaney had matured considerably in that she was willing to seek and take advice and would reach out if she needed help.

Louton denied any domestic violence had occurred between him and Dulaney. He said that Dulaney had come to court and admitted she had lied and that he had spent several days in jail for nothing. He said that he flew to Arkansas for KL's birth but had gotten "the runaround" and returned to Colorado only to receive a text message at the airport saying that his son had been born. Louton said that he saw KL shortly after his birth and wanted to take him but that Dulaney had said KL was too young. Louton testified that he had been providing money for Dulaney but had stopped when he learned that she was spending it on drugs.

He said that when he got a call from Dulaney saying that she was going to rehab, he immediately began the drive to pick up KL. When he arrived, the boy's clothes did not fit; he was wearing his sister's shoes, which were too big for him; he was not potty trained; he was not talking; and he was "kind of crawling and trying to grab stuff and stand up." He said that, while he had KL in Colorado, he had hired a tutor who specialized in speech therapy for young children. He said that he had kept KL for eight or nine months and that, during that time, Dulaney had called only twice. She had asked to see the child when she learned that he was in Hot Springs, but Louton did not allow it because he did not know whether Dulaney was "clean" and had been advised by his attorney to have "zero contact" with her.

He said that when Dulaney came to Colorado to get KL because the court had returned custody to her, he was forced to "jerk" the child out of bed at 6:00 a.m. and that

the child did not recognize Dulaney as his mother. He said that, while he was packing a bag for KL, Dulaney snatched the child and ran without letting him say goodbye.

Louton stated that Dulaney had a pharmaceutical-drug problem when they were married; that she went to drug rehab during their divorce, at which point she was impregnated by another man; that she had been committed to numerous mental facilities; that she had never held down a job; that she drew a check from the military and for disability and "keep[s] it under the table"; that she had lived in at least ten residences in the past seven or eight years; and that she had permitted new boyfriends to move in with her.

Louton said that he is a mechanic with flexible work hours and that he had owned a garage in Hot Springs. Louton testified that his garage is now at his home in Colorado, that he has multiple units—about 4,000 square feet of workspace—which he rents to different businesses; and that he works there and has three employees. He said that he made $100,000 in 2014 and had done "quite well" in 2015 and would make around $240,000. He testified that he also buys and sells cars and that he owns a Bentley Continental, a GT, a Lamborghini Murielago, and a couple of "other exotic ones." His home in Colorado is worth $400,000. Louton testified that he lives alone in Colorado but that some friends from Hot Springs live nearby. Also, his father is retired and lives next door.

Louton admitted that he uses marijuana but explained that it is not illegal in Colorado and that he uses it for pain management after having broken his back and tailbone. He said that he smoked marijuana three days prior to the hearing but that he holds a medical-marijuana license. He said that he grew marijuana until KL came to live with him, and then he kept his stash in a storage unit down the road.

The trial court then took the matter under advisement and requested an "Affidavit of Financial Means" from both parties. Louton indicated in the affidavit that he was self-employed, that he earned $8,382.75 per month, and that his net pay was $6,044.75. The affidavit reflects that Louton had $38,300 cash on hand or in banks and that he had $5,200 in stocks and bonds. His monthly expenses totaled $6,560, including a car payment of $2,450 and $400 in auto insurance. His monthly payments made to creditors totaled $9,101.

## III.   *Trial Court's Ruling*

The trial court placed custody of KL with Dulaney and ordered visitation for Louton. In a letter opinion dated April 20, 2016, the trial court wrote that

> I shall order child support payable to Ms. Dulaney based upon Mr. Louton's Affidavit of Financial Means. I shall reduce one-half (1/2) of the child support while the child is in Dad's possession under the terms of the Order. I shall disallow all but $1,000.00 of the car payment, as his testimony reflected multiple vehicles, and his auto insurance shall be reduced to $200.00. This shall reduce his monthly expenses to $4,960.00. Therefore his net pay is $6,044.75 from line 23h on the Affidavit of Financial Means. There was no dollar amount entered on line 24i as other deductions. His monthly expenses by his figures totaled $6,560. By my figures it should have been $4,960. You can't have $38,300 in bank and stocks of $5,200 making the amount of income reported and having the expenses Mr. Louton claims. I shall impute income based on Mr. Louton's claim from the witness stand that he will make $250,000 during 2016 and set child support of $1,000 per month after acknowledging he shall be responsible for all transportation costs.[2]

In the order entered May 31, 2016, the trial court found the following:

> Based upon Mr. Louton's Affidavit of Financial Means, the Court finds that Mr. Louton's net pay per month is $6,044.75 and imputes yearly income of $250,000.00 to Mr. Louton based upon his testimony that he would make $250,000.00 in 2016. Based upon Administrative Order No. 10 and income of $250,000 for 2016, the Court sets Mr. Louton's monthly child support amount at $1,000.00 per month to be reduced by one-half when the child is in the possession of Mr. Louton.

---

[2]The trial court was mistaken in finding that Louton testified that he would make $250,000 in 2016—he said that he would earn $240,000 in 2015.

IV. *Discussion*

A. Custody

Child-custody cases are reviewed de novo, but we will not reverse a trial court's findings of fact unless they are clearly erroneous. *Overstreet v. Overstreet*, 2013 Ark. App. 710, 430 S.W.3d 857. A finding of fact is clearly erroneous if, after reviewing all of the evidence, the appellate court is left with a definite and firm conviction that a mistake has been made. *Id*. The question of whether a trial court's findings are clearly erroneous turns largely on the credibility of the witnesses; therefore, we give special deference to the trial court's superior position to evaluate the witnesses, their testimony, and the child's best interest. *Id*. There are no cases in which the trial court's superior position, ability, and opportunity to observe the parties carry as great a weight as those involving minor children. *Id*. The primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Starr v. Starr*, 2015 Ark. App. 110, 455 S.W.3d 372.

Louton argues that the trial court failed to consider the favored status of joint custody as per Ark. Code Ann. § 9-13-101(a)(1)(A)(iii) (Supp. 2015), which provides, "In an action for divorce, an award of joint custody is favored in Arkansas." Louton relies on *Ryan v. White*, 2015 Ark. App. 494, 471 S.W.3d 243, where this court held that

> [w]e acknowledge that the "*favored*" status of joint custody specifically applies in divorce cases rather than custody cases involving children born to unmarried parents but note that section 9-10-109 expressly provides that, once paternity has been established, the court is ordered to follow "the same guidelines, procedures, and requirements . . . as if it were a case involving a child born of a marriage in awarding custody [and] visitation . . . ."

*Id*. at 8, 471 S.W.3d 243, 248 (emphasis in original).

The *Ryan* court further held that the presumption of awarding custody to the mother is erased once paternity is established. Here, the acknowledgement and judgment of paternity was filed in January 2015, so Louton contends that the trial court should have considered joint custody but that the trial court specifically declined to apply it.

At the conclusion of the hearing, the following colloquy occurred between the trial court and Louton's counsel:

TRIAL COURT:     Okay. All right. No one has argued because I don't know that it applies. The legislature in their wisdom stated by passage of a statute, that in a divorce case there is, ah, sort of I don't even know if it's a presumption but it must be addressed as far as joint custody goes. I don't believe it applies to paternity cases. I don't think they went that far but then I've not seen any, ah, appellate work that would—would bring that into account. I know there's some cases milling around out there people have thought about doing but do you all know of any statutory requirement?

MR. JOHNSON:     No, I—I made the exact same argument in another paternity case that I had and the judge said the presumption only exists in an initial divorce proceeding which is what the statute says. So I mean he wouldn't even listen to the argument. Besides that I don't know about any appellate case law.

To the extent that Louton preserved his argument on the applicability of section 9-13-101, we note that this court held in *Fox v. Fox*, 2015 Ark. App. 367, 485 S.W.3d 18, that, although our legislature had amended section 9-13-101 to state that an award of joint custody is favored in Arkansas, joint custody is by no means mandatory. In its oral ruling from the bench, the trial court mentioned that shared custody may not be "economically practical." Moreover, the trial court could have concluded that joint custody would not have worked because the testimony from both parties was that they did not get along and could not communicate.

SLIP OPINION

Our law remains consistent that custody awards are to be made solely in accordance with the welfare and best interest of the children. *Fox*, *supra*. Louton does not argue that awarding custody to Dulaney was not in his son's best interest. There was evidence from which the trial court could have concluded that it was in KL's best interest to be placed in Dulaney's custody. The trial court could have considered that Dulaney had not used drugs in over a year and continued to attend NA meetings. The trial court could have also considered the fact that KL's siblings and extended family live in Hot Springs. Also, the testimony suggests that Dulaney was more willing to allow contact between KL and Louton than the other way around. Moreover, the trial court could have considered the attorney ad litem's recommendation that custody of KL should be given to Dulaney. Joint custody is not mandatory, and we cannot say that the trial court clearly erred in determining that custody with Dulaney was in KL's best interest. Therefore, we affirm on this point.

## B. Child Support

Our standard of review from a child-support order is de novo on the record, and we will not reverse a finding of fact by the trial court unless it is clearly erroneous. *Fox*, s*upra*. As a rule, when the amount of child support is at issue, we will not reverse the trial court absent an abuse of discretion. *Id*. A trial court's conclusion of law, however, is given no deference on appeal. *Id*. In determining a reasonable amount of child support, the court shall refer to the most recent revision of the family-support chart. Ark. Code Ann. § 9-12-312(a)(3)(A). It shall be a rebuttable presumption for the award of child support that the amount contained in the family-support chart is the correct amount of child support to be awarded. Ark. Code Ann. § 9-12-312(a)(3)(B). Only upon a written finding or specific

finding on the record that the application of the family-support chart would be unjust or inappropriate, as determined under established criteria set forth in the family-support chart, shall the presumption be rebutted. Ark. Code Ann. § 9-12-312(a)(3)(C). All orders granting or modifying child support shall contain the court's determination of the payor's income, recite the amount of support required under the guidelines, and recite whether the court deviated from the family-support chart. Ark. Sup. Ct. Admin. Order No. 10, § (I) (2016).

For self-employed payors, support shall be calculated based on the last two years' federal and state income tax returns and the quarterly estimates for the current year. Ark. Sup. Ct. Admin. Order No. 10, § (III)(c). Also, the court shall consider the amount the payor is capable of earning or a net-worth approach. *Id.* Section (III)(d) provides under "Imputed Income," if a payor is unemployed or working below full earning capacity, the court may consider the reasons therefor. Ark. Sup. Ct. Admin. Order No. 10, § (III)(d).

Louton argues that the trial court erred in not considering his tax returns, which were neither introduced nor referenced, and points out that his testimony and affidavit of financial means were inconsistent. Louton cannot complain about the trial court's failure to consider his tax returns when he did not produce the returns or the quarterly estimates for the current year. Moreover, he cannot fault the trial court for inconsistencies in his own testimony and the affidavit of financial means that he prepared. A person cannot complain of an alleged erroneous action of the trial court if he himself induced such action. *Clark v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 286, 493 S.W.3d 782.

We agree, however, with Louton's argument that the trial court erred in imputing income to him. Louton testified and indicated on his affidavit of financial means that he was

11

self-employed. Although there was no evidence that he was ever unemployed or under-employed, the trial court imputed yearly income of $250,000 to Louton. At the same time, the trial court determined that Louton's net monthly pay was $6,044.75. Neither amount, when applied to the family-support chart, corresponds to an award of $1,000 per month in child support, and we are left wondering how the trial court arrived at this figure. Accordingly, the child-support award is reversed, and we remand for a proper analysis in accordance with Administrative Order No. 10. *See Colley v. Colley*, 2014 Ark. App. 698, 450 S.W.3d 274 (reversing and remanding where the trial court did not "completely perform the required analysis" and holding that the trial court erred as a matter of law by failing to follow the appropriate procedure).

Affirmed in part; reversed and remanded in part.

GRUBER, C.J., and WHITEAKER, J., agree.

*The Applegate Firm, PLLC*, by: *Ryan J. Applegate*, for appellant.

*Wood, Smith, Schnipper, Clay & Vines*, by: *Beau Britton*, for appellee.