BART F. VIRDEN, Judge
Lyndon Tyler Bundy challenges the Woodruff County Circuit Court's decision to award Brooklynn Gage Womble primary custody of the parties' son, BW (born 6/6/14). On appeal, Bundy argues that the circuit court's decision is contrary to the best interest of the child and that the circuit court erred in denying his request for a new trial. We affirm.
I. Facts
On February 1, 2017, Bundy filed a petition for paternity in which he argued that he was the biological father of BW, and it would be in BW's best interest for the court to award him primary custody of BW with visitation granted to the mother. Bundy also asked the circuit court to order Womble to pay child support and to change BW's last name to Bundy. On September 6, 2017, the circuit court held a *431 hearing on the matter during which Bundy described his and Womble's relationship history. Bundy explained that when he was twenty years old and Womble sixteen years old, they were in a relationship that resulted in Womble's becoming pregnant with BW. By the time Womble gave birth, the parties had broken up and were not getting along. Bundy testified that although a paternity test shows he is BW's father, Womble had not allowed his name to appear on the birth certificate because she did not like him. Bundy also testified that Womble had allowed liberal visitation with BW since his birth and that at the time of the hearing his visitation with BW was around "fifty-fifty." Bundy explained that if Womble had other plans, wanted more money, or was "mad" she would withhold visitation. Bundy testified that there was no court order for visitation.
Bundy contended that he was concerned about BW's living situation with his mother in McCrory, namely that Womble, BW and Womble's other child lived in a two-bedroom apartment with Womble's boyfriend, her sister, and her sister's child. Bundy asserted that Womble and her boyfriend had a contentious relationship and frequently argued, which caused BW to be angry, nervous, and reluctant to leave with his mother when she came to pick him up. Bundy also expressed concern that he had noticed that BW was dirty and had a bad odor when he picked BW up from daycare.
By contrast, Bundy described his three-bedroom home in Bradford, which is about a forty-minute drive from McCrory. Bundy explained that at his home BW would have his own bedroom, toys, a television in his bedroom, and a large yard. Bundy testified that he lives very close to his grandmother, who watches his daughter while he is at work, and that she would also watch BW if he had primary custody. Bundy stated that he works from 7:30 a.m. to 3:30 p.m. Monday through Friday, with twelve holidays off a year.
Bundy testified that he had not been ordered by the court to pay child support but that he bought clothes, food, diapers, and any other supplies that BW needed. He paid for BW's daycare until Womble was able to get free childcare, and after that, he paid Womble $150 every two weeks. In December 2016, Bundy ceased paying $150 to Womble and instead bought things that BW needed. Bundy testified that at times he had helped Womble pay bills and her car payment "because BW came first."
On cross-examination, Bundy denied that Womble had ended their relationship when she was seven months pregnant because of his infidelity. Bundy denied that he had referred to a former girlfriend as his "mess around girl," and he admitted that his wife had been pregnant when they married. Bundy denied having cheated on his wife. Bundy admitted that he used a racial slur during a disagreement with Womble about how she had dressed BW.
Bundy explained to the court that he wanted primary custody to ensure that BW was "more taken care of." Bundy testified that he believed Womble should have visitation and "be a good mom to him and put him above work and everybody else. I want her to prioritize him, as I do." Bundy testified that he did not believe that BW "gets the full amount of attention" living with Womble because BW "wants to be up in your lap, in your face, wants you to play toys with him in the floor[.]"
Bundy's mother, Delena Little, testified that she often keeps BW in her home and has a very close relationship with him. Little stated that she had been concerned about BW because when he becomes frustrated or things do not go right, he falls to the floor and bangs his head. Little also stated that she had seen Womble smack *432 BW's hand when he was ten months old; and when BW was one year old, she had spanked him. Little testified that when BW was fourteen months old and had refused to sit in the barber's chair, she saw Womble jerk BW's arm and spank him. Little also asserted that on one occasion Womble's apartment had been infested with fleas and that Womble "had to set off bombs to get rid of them. BW was covered in flea bites." Little explained that when she picks BW up from daycare he is "filthy" and "it's normal to pick him up, take him home and bathe him." Little also conceded that children get dirty "at the drop of a hat." Little stated that Womble had allowed her to be in BW's life without a court order "because it fit her schedule and she had other things that I believe were more important to her than BW." Little also stated that Womble "tricked [Bundy] into getting her pregnant."
Womble moved for dismissal based on a lack of evidence that it was in the child's best interest to award primary custody to Bundy, and the circuit court denied the motion.
Womble testified that she had been a junior in high school when she gave birth to BW. Womble explained that she did not put Bundy's name on the birth certificate because he had not seemed "like he cared that he was going to have a baby" and that he had not attended any of her obstetric appointments. Womble testified that she would like BW's last name to be changed to Bundy and for Bundy's name to appear on the birth certificate because "Lyndon deserves that because Lyndon is a very good dad."
Womble stated that during high school, she earned a college scholarship for softball but that after BW was born, she gave up playing sports and had to "study ten times harder" because she was up late at night with BW. Womble explained that she quit playing basketball and softball, and she finished high school while she raised BW. She testified that she began working at Subway during high school to provide for BW and that she had continued to work at Subway full time after she graduated. Womble stated that she had been "one point away" from being accepted into a nursing program and that she planned to try again and further her education. Womble testified that she worked forty hours a week from 8:00 a.m. to 4:00 p.m. at Subway and that about two weeks out of the month she worked around three to five hours in overtime. Womble that she was generally off on the weekends, but if she had to work, her boyfriend or her sister watched BW.
Womble testified that she allowed visitation with Bundy without a court order for visitation because "I think it is very important for him to know and have a relationship with his father.... I did that voluntarily. I tried to put aside whatever differences the two of us had." Womble explained that Bundy "likes to control things ... but he, you know, wants it his way or the highway." Womble denied that she had ever withheld visitation from Bundy to punish him.
Womble testified that she had heard the testimony regarding BW banging his head, and she denied having caused it. Womble stated that she and her sister share an apartment with her own two children and her sister's oldest child. She explained that she was temporarily helping her sister and that her sister was looking for another place to live. Womble clarified that her boyfriend, who is the father of her younger child (MW), had moved out because she did not want the children to be around the arguing that occurred when he lived there.
Womble agreed with Little's testimony that she had swatted BW's hand when he was ten months old and that she spanked *433 him on the bottom; however, she stated that she had never abused BW or yanked his arm. Womble explained that she had talked to Bundy about "getting him on the same discipline level with me, and he never did. They don't. They don't discipline."
Womble explained that once, the family dog had gotten loose and had brought fleas into the house when he returned. When Womble noticed a few small flea bites on BW's ankles, she took care of the problem the next day, and it had never occurred again. Womble agreed that sometimes BW becomes dirty but that is normal, and she bathes him and washes his clothes. Womble admitted that she is busy with two kids and working full time and that
it would not surprise me if there was a stain on his shirt, or now the dirt under his toenails, it's not like he didn't have a bath the night before. I'm not going to pick at his toenails at 8:30 in the morning before I take him to daycare ... I mean, sometimes in the morning he'll go outside and play in the dirt[.] ... I mean like it's in a matter of minutes. They can get dirty just like that.
Regarding the issue of child support, Womble reiterated much of Bundy's testimony. Womble testified that for the first six weeks of BW's life, Bundy paid her $150 in child support every two weeks. When BW began attending daycare at six weeks, Bundy paid for daycare. Womble stated that she when she obtained free daycare, Bundy had resumed paying her $150 every two weeks until December 2016 when he married. In December 2016, Bundy ceased paying Womble any support; instead he paid for clothing, food, and other things BW needed. Womble testified that when she asked for monetary support, Bundy told her that "MW's child support could help me." Womble clarified that sometimes Bundy asked her if she wanted him to get anything for BW and that if BW did not need anything at that moment she would decline his assistance.
Deanna George, Womble's mother, testified that she believes her daughter is a very good mother. George testified that Womble had done everything for BW when he was an infant and that her daughter would not let her get up with BW in the night, even though Womble was working and going to high school. George explained that Womble told her that BW was her responsibility, and she testified that Womble gave up playing high school sports to take care of BW. George stated that Womble regularly bathes BW and that Womble and BW have a close bond. George also asserted that Womble appropriately disciplines BW when he needs it. George characterized Bundy as controlling and manipulative and that "[i]f something isn't done exactly the way he thinks it should be, it's completely wrong and terrible."[1] After the testimony and closing arguments the circuit court took the matter under advisement, and the hearing was adjourned.
On September 18, 2017, Bundy moved for a new trial based on newly discovered evidence. Bundy asserted that when he picked BW up from daycare on September 15, he noticed a "large wound" on BW's scalp and immediately took BW to the doctor. Bundy attached photocopies of pictures of the cut and a printout of a text Womble sent to him in which she explained *434 that she had accidentally hit BW on the head with the car door as she closed it. Bundy also attached the examining physician's report stating that BW had a "half-inch lesion" without bruising and that the cut required two staples to close. Bundy asserted that Womble had withheld vital information from him and had failed to obtain medical care "for the injury she caused." The circuit court did not rule on the motion.
On October 2, 2017, the circuit court entered an order in which it determined that Bundy established paternity as the biological father, that BW's surname shall be changed to Bundy, and that Bundy's name shall be added to the birth certificate. The circuit court awarded primary custody to Womble and ordered Bundy to pay $213 in child support on a biweekly basis. The circuit court found that due to the distance between the parties' residences and their inability to cooperate, joint custody is not in the best interest of the child.
In its order, the circuit court specifically found that Womble was a credible witness. The circuit court also made extensive factual findings to support its custody determination, and the relevant findings are as follows. In 2016, the relationship between Womble and Bundy deteriorated, and the parties began to have increased conflict regarding parenting BW. In February 2017, Bundy filed a petition for paternity. The circuit court found that Womble had allowed liberal visitation with BW without a court order and that Bundy had provided financial support also without a formal order. For a period of time, Bundy had provided direct funds to Womble, and he had paid for BW's daycare when it was not provided free of cost. Bundy provided clothing, wipes, diapers, food, and toys as well; however, when he married in December 2016, Bundy ceased providing funds for BW. Beginning in December 2016, Bundy continued to contact Womble to offer to purchase needed items for BW. Bundy had family support such that when BW was in his care, BW did not require daycare. Bundy lives in a three-bedroom home that he shares with his wife and daughter. BW has his own room, toys, and furniture at Bundy's home. The court acknowledged the testimony that BW had been dirty and wearing dirty clothes when he left Womble's home. The court also found that Bundy had belittled Womble for the way BW was dressed, including having made a racial slur. The circuit court found that Womble had given birth to Bundy's child when she was sixteen years old and Bundy was twenty years old and that Bundy had been more interested in romantic pursuits than he was the birth of his child. The circuit court found that Womble had graduated from McCrory High School while caring for BW and had been forced to give up school sports to be BW's primary caretaker. The court noted that although Womble lived with her mother after BW's birth, Womble insisted that she assume all responsibility for her child, including getting up in the middle of the night, changing diapers, and doing "all things necessary to make sure the child was taken care of." The circuit court found that Womble had maintained steady employment since BW's birth, that she had applied to nursing school, and that she shared an apartment with her sister and her sister's child until they could find other housing.
Bundy timely filed his notice of appeal.
II. Standard of Review
In custody matters, this court considers the evidence de novo and does not reverse unless the circuit court's findings of fact are clearly erroneous.
*435 Burr v. Burr , 2015 Ark. App. 640, at 6, 476 S.W.3d 195, 198. A finding is clearly erroneous when, although there is evidence to support it, the court is left with a definite and firm conviction that the circuit court made a mistake. Id. Because the question of whether the circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest. Grantham v. Lucas , 2011 Ark. App. 491, at 4, 385 S.W.3d 337, 340. There is no other case in which the superior position, ability, and opportunity of the circuit court to observe the parties carries a greater weight than one involving the custody of minor children. Fox v. Fox , 2015 Ark. App. 367, at 6, 465 S.W.3d 18, 22. The best interest of the children is the polestar in every child-custody case; all other considerations are secondary. Id. We have held that the fact that a parent has been the child's primary caregiver is relevant and worthy of consideration in determining which parent should be granted custody. Thompson v. Thompson , 63 Ark. App. 89, 974 S.W.2d 494 (1998).
III. Points on Appeal
For his first point on appeal, Bundy argues that the circuit court's finding that it is in BW's best interest to award Womble primary custody is not supported by the evidence. Specifically, Bundy argues that Womble's apartment is too crowded, that sometimes her boyfriend lives with them, that she had used corporal punishment to discipline BW, that she had not properly cared for BW's hygiene, that she worked forty to forty-five hours a week, and that she had to put BW in daycare while she worked. By contrast, Bundy asserts that he has a better home environment, that he is more careful regarding BW's cleanliness, and that his grandmother can watch BW while he works. Bundy's argument is not well taken, and we affirm.
On our de novo review, we hold that the circuit court did not clearly err in finding that it was in BW's best interest to be placed in the primary custody of his mother. Bundy, Womble, and the testifying witnesses offered conflicting testimony regarding Womble's and Bundy's home environments, BW's hygiene, parental-discipline methods, relationship history, and family stability. Essentially, Bundy asks this court to reweigh the evidence, which it cannot do. Wilhelm v. Wilhelm , 2018 Ark. App. 47, 539 S.W.3d 619. Conflicts in the testimony are for the circuit court to resolve, and we will defer to the circuit court's superior position to judge and determine the credibility of witnesses. Richardson v. Brown , 2012 Ark. App. 535, at 8, 423 S.W.3d 630, 635. In light of the circuit court's extensive findings and the specific finding that Womble had credibly testified, we are not left with a definite and firm conviction that the circuit court erred in rejecting Bundy's request for primary custody, and on this point we affirm.
Bundy also argues that the circuit court erred in denying his motion for a new trial under Arkansas Rule of Civil Procedure 59(a)(7). He is incorrect.
A motion for new trial under Ark. R. Civ. P. 59 is addressed to the discretion of the circuit court. Jones v. Double "D" Props., Inc. , 352 Ark. 39, 48, 98 S.W.3d 405, 410 (2003). Arkansas Rule of Civil Procedure 59(a)(7) allows the circuit court to grant a new trial when the substantial rights of a party are materially affected based on newly discovered evidence material for the party applying, which he could not, with reasonable diligence, have discovered and produced at the trial. The applying party is required to support the motion with affidavits showing the truth of the newly discovered evidence.
*436 Ark. R. Civ. P. 59(c). A new trial based on newly discovered evidence is not a favorite remedy; to prevail on a motion pursuant to subsection (a)(7), the moving party must show that the evidence would probably have changed the result of the trial. Lee v. Lee , 330 Ark. 310, 312, 954 S.W.2d 231, 233 (1997). In determining whether the evidence asserted as the basis for this ground is to be regarded as previously discoverable and whether sufficient diligence was used, the circuit court may exercise discretion, which will not be reversed absent abuse.
It is clear that the circuit court received the new information regarding the cut on BW's scalp on September 18, 2017, about two weeks before the decision was entered on October 2, 2017. Bundy argues that the circuit court erred by failing to consider the new evidence; however, the new information was submitted to the circuit court before the opinion was entered. Furthermore, the circuit court was well within its province to find Bundy's new evidence unpersuasive. The fact that new information has been discovered that might merely impeach or otherwise test the credibility of a witness is not sufficient reason to warrant a new trial. Id. Accordingly, we hold the trial court did not abuse its discretion in denying Bundy's motion.
Affirmed.
Harrison and Klappenbach, JJ., agree.

Throughout the hearing, there was testimony from several witnesses regarding Bundy's decision to change his surname from "Little" to his maternal grandfather's surname "Bundy" when he was around 18 years old. Witnesses for Bundy testified that his decision to change his name had nothing to do with an argument with his father, while witnesses for Womble testified that Bundy changed his name because had been angry with his father for reprimanding him when they were working together at his father's business.