N. MARK KLAPPENBACH, Judge
This appeal concerns custody of a child born in 2009 to parents who were not married. Appellant Roberto E. Carrillo appeals the January 2018 order of the Jefferson County Circuit Court that denied his request for joint custody of his son and that granted custody to the child's mother, appellee Nancy Morales Ibarra. Roberto argues that the circuit court failed to give "due consideration" to Arkansas's statutory preference for joint custody and therefore erred in rejecting joint custody. We affirm.
Child-custody cases are reviewed de novo on appeal, but we will not reverse a circuit court's findings of fact unless they are clearly erroneous. Louton v. Dulaney , 2017 Ark. App. 222, 519 S.W.3d 367. A finding of fact is clearly erroneous if, after reviewing all the evidence, the appellate court is left with a definite and firm conviction that a mistake has been made. Id. Whether a circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses; therefore, we give special deference to the circuit court's superior position to evaluate the witnesses, their testimony, and the child's best interest. Id. There are no cases in which the circuit court's superior position, ability, and opportunity to observe the parties carry as great a weight as those involving minor children. Id. The primary consideration in child-custody cases is the welfare and best interest of the child; all other considerations are secondary. Id.
The following law is relevant to this case. In an action for divorce, custody shall be made without regard to the sex of a parent but solely in accordance with the welfare and best interest of the child, and an award of joint custody is favored. Ark. Code Ann. § 9-13-101(a)(1)(A)(i), (iii) (Repl. 2015). When in the best interest of a child, custody shall be awarded in a way that assures frequent and continuing contact of the child with both parents consistent with subdivision (a)(1)(A). Ark. Code Ann. § 9-13-101(b)(1)(A)(i). In making the custody decision, the circuit court "may" consider awarding joint custody, Ark. Code Ann. § 9-13-101 (b)(1)(A)(ii), and the circuit court "may consider, among other facts" which party is more likely to allow the child frequent and continuing contact with the noncustodial parent, Ark. Code Ann. § 9-13-101(b)(2). Once paternity has been established, the circuit court is to follow the same guidelines, procedures, and requirements as if it were a case involving a child born of a marriage in awarding custody and visitation. See Ryan v. White , 2015 Ark. App. 494, 471 S.W.3d 243.
The facts of this case are, for the most part, undisputed. Roberto and Nancy had lived together for several years when their son, EC, was born in June 2009 in Arkansas. At that time, they were living in Redfield. Roberto signed an acknowledgement of paternity and was recognized as the child's father on the birth certificate. The parties separated for some months in 2011, but they reconciled and continued to live together as a family until the fall of 2013. When they separated, EC remained with Nancy. In May 2016, Roberto filed a petition seeking to formally establish paternity, *153 to acquire temporary visitation rights, and ultimately to have custody. In June 2016, the parties entered into an agreed temporary order in which Nancy continued to have custody while Roberto was entitled to specific visitation. An attorney ad litem was appointed to represent EC's interests.
The matter was heard before the circuit court in July 2017 when EC was eight years old. EC was universally deemed a bright, pleasant, talented, and well-adjusted child. There was no dispute that both Roberto and Nancy are loving parents, both have good full-time jobs, and both are financially responsible toward their son. However, the parties had difficulty in communicating and agreeing where EC was concerned. Roberto wanted to have joint custody, whereas Nancy did not. Roberto asserted that he is an involved and loving father, that he lives close enough to make joint custody work, and that joint custody would be best for their son. Roberto complained that after he and Nancy separated, and until the temporary order was entered, Nancy refused to allow him to have their son overnight, and she was very controlling. Roberto stated that since the temporary order had been entered, he had had his son for every possible visitation and that their relationship was great. Nancy contended, in sum, that she had been EC's primary caregiver his whole life and that Roberto was uncooperative and unreliable in ways that made joint custody not a viable arrangement.
Nancy's mother, who lived near Nancy in Redfield, testified that she helped care for her grandson for both Nancy and Roberto and that, regardless of this litigation's outcome, she would continue to help. EC would typically come to her house after school when he got off the bus, and one of the parents would come get EC after his or her workday ended. The grandmother also kept EC some in the summertime. She did not express any substantive concerns about Roberto's parenting, but she noted that Nancy was the parent who took EC to school and tended to doctor's visits.
By the time of the hearing, Roberto was living in a home that was approximately a fifteen-minute drive from Nancy's house. Roberto said that he had flexibility with his job to take off work if his son got sick or needed something. Roberto acknowledged that he and Nancy had had "maybe a couple of disagreements" or "misunderstandings" but that they had worked out those issues. He agreed, though, that they had difficulty communicating with each other and that he would rather not talk to Nancy. He said that their differences were "in a way, good differences." He said that one time, Nancy asked him to take off work to care for EC because he was ill, and he took off work, but she sent EC to school the next day without telling him. He recalled another time that Nancy let EC spend the night with a friend, but Nancy would not tell him where EC was or give him a phone number to reach EC, which greatly concerned him. Ultimately Nancy went to get EC, and Roberto was able to talk to his son.
Roberto supported the many activities that EC participated in, but he said that Nancy did not inform him that she had enrolled EC in karate classes. Roberto did not often take EC to doctor's and dentist's appointments but said he was present for the important ones. Nancy and Roberto disagreed whether EC had an eating disorder (not eating enough); she thought EC did, but Roberto "knew [EC] was eating," at least at his house. Roberto spent quality time with EC and shared his hobbies with him, but he had not attended any parent-teacher conferences, claiming to be unaware of when those conferences were going to take place. Roberto felt that his son *154 wanted to live with him, and he had told EC that they were "going to see the judge" about having more time together. Roberto suggested a week-on, week-off schedule with his son.
EC's first-grade and second-grade teachers testified that EC was a good student, that they had seen Nancy at many school-related events, and that Nancy clearly made EC's education a priority. They had no complaints about Roberto but noted that he had come to school only a few times and had not made efforts to communicate with them about EC. Roberto had not signed up for text or email alerts, nor had he attended parent-teacher conferences.
Nancy testified that she has a full-time job and co-owns a daycare in Redfield, where EC would go when her mother could not care for EC. Nancy recited all the daily, academic, and extracurricular activities in EC's life and her involvement; she also recounted all of EC's events that Roberto had missed despite her having sent Roberto texts and emails about those events. Nancy recognized that they both had difficulties in communicating with each other and had different views on how to parent EC. She said that Roberto did not believe EC had an eating disorder, telling her that she was crazy and refusing to abide by any of the therapist's recommendations. She also said that Roberto was not initially supportive of EC's taking karate lessons. Nancy testified that Roberto refused to go to therapy to improve their communication even though therapy had been recommended. They had both, in the past, raised their voices to each other, but she said she had made a concerted effort to stop doing that. Nancy explained that she asked Roberto to take off work to care for EC one time, but he had instead sent her his employer's leave policy. Nancy testified about one incident in which she permitted EC to spend the night with his best friend (the child of a well-known friend), but Roberto became very upset and demanded that EC go home; as a result, she went to get EC. Nancy agreed that after the temporary order was in place, overnight visitation had apparently gone well. Nancy wanted EC to have a good relationship with his father, but she was concerned that joint custody would not work, given Roberto's lack of involvement in EC's schooling and healthcare and given their difficulties in reaching agreements about EC's everyday life.
The attorney ad litem recommended that although both Roberto and Nancy adore their son, EC should remain in his mother's custody. The attorney ad litem believed that EC needed to have one parent "in charge" and that joint custody would be disruptive to EC in having to go back and forth week to week between homes. Roberto's attorney urged an award of joint custody, but if joint custody was not viable, Roberto should then have custody. Nancy's attorney stated that the lack of cooperation between these parents made joint custody unworkable and harmful to the child, that Roberto was not very involved in EC's academics or healthcare, that Roberto had not demonstrated a desire to work with Nancy, and that Nancy had encouraged the relationship between EC and his father. Nancy's attorney stated that EC was thriving in the current custody-and-visitation arrangement, which was serving EC's best interest.
After considering the matter for a couple of weeks, the circuit court informed the parties of its decision to award custody to Nancy. The circuit court "reject[ed] an award of joint custody because of the inability of the parties to cooperate in the care and welfare of the minor child." The circuit court relied on their conduct in the past as the only indicator of how the parties would interact in the future:
*155 [Nancy] has been the primary caregiver for [EC]. The parties have demonstrated an inability to communicate and cooperate. On at least one occasion, the minor child was sick, [Roberto] took off work to care for the child, and [Nancy] sent the child to school anyway. They have failed to communicate and cooperate regarding the child's refusal to eat at [Nancy's] home. Either [Roberto] has a lack of trust in [Nancy's] ability to decide who the child can stay with on an overnight basis or [Roberto] is over protective. The parties could not agree on overnight visitation for [Roberto] until there were attorneys involved. The parties have not agreed on extra-curricular activities.
The circuit court set Roberto's visitation as every Wednesday night, every other weekend, five weeks in the summer, and alternating major holidays, with reasonable telephone contact at any time.
Roberto appeals, contending that the circuit court failed to give due consideration to the statutory preference in Arkansas to award joint custody. We disagree. While there is a statutory preference for joint custody, this preference does not override the ultimate guiding principle, which is to set custody that comports with the best interest of the child. See Ark. Code Ann. § 9-13-101(a)(1)(A)(i) ; Bundy v. Womble , 2018 Ark. App. 462, 558 S.W.3d 429. An award of joint custody is favored in Arkansas, but joint custody is by no means mandatory, and a failure by the circuit court to award joint custody does not mean that the circuit court failed to consider awarding joint custody. See Wilhelm v. Wilhelm , 2018 Ark. App. 47, 539 S.W.3d 619. The circuit court here expressly stated that it considered but rejected joint custody because the parties could not communicate and cooperate.
To the extent that Roberto is arguing that the circuit court considered joint custody but clearly erred in not awarding joint custody, we disagree. Roberto contends that the disagreements he had with Nancy were insignificant and that they had been effectively coparenting, making joint custody the best choice for EC. This argument, however, asks us to reweigh the evidence and the credibility of the testimony in a manner that is more favorable to him, which is not our function on appeal. See Cooper v. Merwether , 2018 Ark. App. 282, 549 S.W.3d 395. The deference we give to the superior position of the circuit court to view and judge the credibility of the witnesses is even greater in cases involving child custody, as a heavier burden is placed on the circuit court to use its powers of perception in evaluating the witnesses, their testimony, and the best interest of the child. See Cooper v. Kalkwarf , 2017 Ark. 331, 532 S.W.3d 58. Despite joint custody being favored, our law remains that the mutual ability of the parties to cooperate in reaching shared decisions in matters affecting the child's welfare is a crucial factor bearing on the propriety of an award of joint custody. See Li v. Ding , 2017 Ark. App. 244, 519 S.W.3d 738. The circuit court gave great weight to its finding that the level of cooperation and communication that is required for joint custody was lacking here. We recognize that Roberto and Nancy are good parents who love their son, but on de novo review of this record, we are not left with a definite and firm conviction that the circuit court made a mistake in rejecting Roberto's request for joint custody.
Affirmed.
Abramson and Brown, JJ., agree.