Cite as 2020 Ark. App. 204

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-19-163

| | |
|---|---|
| | **Opinion Delivered** April 1, 2020 |
| MARK C. WILLIAMS | |
| | APPEAL FROM THE BAXTER |
| APPELLANT | COUNTY CIRCUIT COURT |
| | [NO. 03DR-16-390] |
| V. | |
| | HONORABLE JOHN R. PUTMAN, |
| | JUDGE |
| AMY MINTON WILLIAMS | |
| | AFFIRMED IN PART; DISMISSED IN |
| APPELLEE | PART |

## N. MARK KLAPPENBACH, Judge

This is an appeal from decrees granting the appellee, Amy Williams, an absolute divorce from the appellant, Mark Williams. The circuit court awarded primary custody of the couple's two minor children to Amy and allowed Mark supervised visitation. Mark appeals the decrees, alleging that they should be reversed because the circuit court clearly erred by awarding custody to Amy; by ordering that he have only supervised visitation; by awarding alimony to Amy; by denying his petition to hold Amy in contempt; and by failing to assign a value to a limited liability company that Amy started during their marriage. We affirm the order awarding custody, but we dismiss the remaining issues without prejudice for lack of a final order.

## I. *Facts and Procedural History*

Mark and Amy were married on April 27, 2002. They lived in Mountain Home, where Mark was self-employed as a physician. Amy, an occupational therapist, primarily stayed at home to care for the couple's two minor children, SW, now fifteen years old, and JW, now eleven years old. On September 8, 2016, Amy filed a complaint alleging that she was entitled to an absolute divorce because, during the marriage, Mark "was guilty of rudeness, contempt, and studied neglect, systematically and continuously pursued to such an extent that it made it impossible for [Amy] to live with [him]."

Mark's poor health and use of prescription medication played a role in the breakdown of the marriage, and his erratic behavior was a topic throughout the course of the divorce proceedings. Contemporaneously with the complaint for divorce, Amy filed a petition for an emergency ex parte order awarding her temporary custody of SW and JW. She alleged that Mark "forgets to feed the children while they are in his care" and was not otherwise providing for the children's "emotional and physical needs."

The petition also related an incident that occurred just days before Amy filed the complaint. According to Amy, Mark took JW and a friend on a boat ride on Lake Norfolk at 8:00 pm on a school night and, despite Amy's repeated efforts to contact him, did not return until he was escorted home by the Arkansas Game and Fish Commission at 2:30 the next morning. Significantly, Amy alleged that despite the lateness of the hour and other circumstances, Mark did not appear to understand her concern about where he had been with the children.

The circuit court granted Amy's request for temporary custody in an emergency ex parte order on September 8, 2016, and heard testimony on the allegations on October 4. On October 20, the court entered a temporary order that "enact[ed] a no contact order between the parties" and awarded temporary custody to Amy and supervised visitation to Mark.

Very shortly thereafter, on November 14, Amy filed a "petition for contempt and relocation," alleging that Mark violated the no-contact order by continuing to send her text messages and by appearing at three visitation exchanges. She further alleged that Mark harassed her brother—with whom she had been living—by phone and text and allowed unapproved supervisors during his visits with the children. Regarding relocation, Amy requested to move to Jonesboro with her brother, where she claimed to have two job opportunities and additional family who would provide support for her and the children. After hearing testimony, the circuit court entered an order on January 9, 2017, that found Mark in contempt and ordered him to a suspended term of three days' confinement in the county jail. The circuit court further ordered him "not [to] be at exchanges of the minor children"; to not come "within fifty (50) feet of [Amy]"; and to otherwise have no contact with Amy. The circuit court did not rule, however, on Amy's request for relocation to Jonesboro.

Amy subsequently filed several more petitions to hold Mark in contempt. In summary, she alleged that Mark failed to comply with the court's order to not be present when the children are exchanged for visitation; that he again contacted her in violation of the no-contact order; that he terminated health insurance in violation of the standard restraining

3

order; that he failed to submit to a court-ordered mental evaluation; that he disposed of some of the personal property they acquired during the marriage; and that he used marital funds to acquire a new truck. Several of these petitions remain pending.

Mark also filed a petition that sought to have Amy held in contempt on two grounds. First, he alleged that Amy moved to Jonesboro in February 2017 in violation of the court's standard restraining order, which provided that Mark and Amy were "enjoined and restrained from causing . . . the minor children . . . to be removed from the jurisdiction of [the] [circuit] court." He further alleged that Amy had "intentionally and repeatedly denied [him] visitation with his children."

The allegations in Mark's petition for contempt were among several issues that the circuit court addressed in three decrees that it entered after the final hearing in the case. The first decree, entered on May 9, 2018, simply granted Amy an absolute divorce "based upon eighteen (18) months of continuous separation," and reserved the remaining issues, including custody, support, division of marital property, and "issues of contempt pending at trial."[1]

The second order, entered on October 30, 2018, addressed the bulk of the remaining issues. In relevant part, the circuit court awarded primary custody of the children to Amy, finding that

> the evidence before the court shows that Dr. Williams's behavior is unpredictable, and ranges from calm and peaceful to aggressive and threatening. He can be rational or irrational. As the court witnessed at trial, Dr. Williams's behavior can change without warning. To complicate matters, Dr. Williams takes a number of medications that affect his ability to safely drive a vehicle or properly supervise his children.

---

[1]The complaint for divorce, which appeared to allege general indignities, was amended to conform to the proof at the final hearing.

4

Accordingly, the circuit court found that it was "without question" that "[Amy] can provide the more stable, appropriate home and environment for the minor children" and that Mark's "visitation with his children must be supervised."

The circuit court also awarded alimony and child support to Amy, setting temporary monthly amounts of $1,000 and $741.18, respectively, until "such time as a supplemental hearing is held or stipulations are presented to the court" regarding Mark's income. The court further ordered that the couple's remaining personal property, in the absence of their written agreement otherwise, would be sold at public auction at a time and place of their choosing and the proceeds of the sale, after payments of costs and debts, would be equally divided between them. The court also equally divided the assets in the couple's whole-life insurance policy, retirement accounts, and bank accounts, including the money in the bank account that Amy established for her limited liability company, Amy Williams, PLLC.

Finally, the circuit court's October 30 decree addressed some of the pending motions for contempt. First, the court denied Mark's petition to hold Amy in contempt. The circuit court found that Amy did not willfully violate the standard restraining order by moving to Jonesboro because the Fourteenth Judicial District has inconsistently defined the term "jurisdiction" as it is used in the standard order. The circuit court also ruled that Amy would not be held in contempt for failing to comply with the temporary visitation order, finding that the evidence on that issue was "in dispute." Finally, the circuit court denied Amy's request to hold Mark in contempt for failing to maintain health insurance for her and the children, ordering instead that he had forty-five days to provide proof that the children's insurance had not been canceled.

The circuit court entered its last decree on February 11, 2019, in which it awarded back-due child support and retroactive alimony according to the temporary amounts set forth in the decree entered on October 30. The circuit court also revisited its ruling concerning the division of the couple's remaining real and personal property. Specifically, the court found that "[t]he parties have not agreed on division of their remaining personal and real property, nor have they agreed on an auctioneer." Consequently, the circuit court appointed an auctioneer to conduct "an absolute auction of the parties' real and personal property as set out in the decree," and further ordered that

> [p]roceeds of the sale shall go first to payment of costs and expenses of the sale, then to payment of outstanding mortgage on the real estate sold. Any net proceeds are to be deposited into the registry of the court via the Baxter County Clerk's Office *pending further orders of this court*.

(Emphasis added.) Mark has timely appealed the decrees entered on October 30, 2018, and on February 11, 2019.

## II. *Issues on Appeal*

Mark raises five arguments for reversal. He argues that the circuit court overlooked evidence in his favor when it granted Amy primary custody of the children and when it ordered that he have only supervised visitation. He also contends that the circuit court clearly erred when it declined to hold Amy in contempt for moving to Jonesboro in alleged violation of the court's standard restraining order, and for failing to compel the children to comply with the temporary visitation order. Mark also asserts that reversal is warranted because the circuit court abused its discretion when it awarded alimony and when it failed to value and divide the limited liability company that Amy started shortly after their separation.

6

## III. *Discussion*

## A. Custody

Mark first argues that the circuit court erred by awarding Amy primary custody of their children. He asserts that "joint custody is favored [in Arkansas] and should have been awarded," or, alternatively, that he should have been awarded primary custody of their son, JW. Mark also notes that "the testimony is overwhelming in regard to [his] love for his children" and "no one testified that [he] has ever acted inappropriately toward his children." He asserts, in fact, that multiple witnesses testified that he adequately cared for SW and JW. Because the record demonstrates that the circuit court did not clearly err when it determined that it was in the children's best interest to live with Amy, we affirm.

We have jurisdiction to review the circuit court's order awarding custody pursuant to Arkansas Rule of Appellate Procedure–Civil 2(d). Further, we review child-custody cases de novo on appeal, but we will not reverse a circuit court's findings of fact unless they are clearly erroneous. *Carillo v. Morales Ibarra*, 2019 Ark. App. 189, at 1, 575 S.W.3d 151, 152. Whether a circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses; therefore, we give special deference to the circuit court's superior position to evaluate the witnesses, their testimony, and the child's best interest. *Id*. at 2, 575 S.W.3d at 152. There are no cases in which the circuit court's superior position, ability, and opportunity to observe the parties carry as great a weight as those involving minor children. *Id*.

"In an action for divorce, the award of custody of a child of the marriage shall be made without regard to the sex of a parent but solely in accordance with the welfare and best interest of the child." Ark. Code Ann. § 9-13-101(a)(1)(A)(i) (Supp. 2019). An award of

7

joint custody is favored, *see* Ark. Code Ann. § 9–13–101(a)(1)(A)(iii), but this preference does not override the ultimate guiding principle, "which is to set custody that comports with the best interest of the child." *Carillo*, 2019 Ark. App. 189, at 8, 575 S.W.3d at 155. Factors a court may consider in determining the best interest of the child include the psychological relationship between the parents and the child, the need for stability and continuity in the child's relationship with parents and siblings, the past conduct of the parents toward the child, and the reasonable preference of a child. *See Rector v. Rector*, 58 Ark. App. 132, 136, 947 S.W.2d 389, 390 (1997).

At the final hearing, SW testified that she, JW, and Amy moved in with her uncle, Richie Minton, on August 29, 2016. She declared that the move made life "a lot less stressful" because her parents were "always fighting." She also explained that her mother was the children's primary caretaker while the family was still living together—waking them in the morning, preparing all their meals, driving them to and from school, and taking them to doctors' appointments.

SW further testified that her father kept a different schedule than the rest of the family and was "always asleep in the mornings" and "always out real late." She also explained that she "would get very upset when he would get mad at [her], because he would get so mad at [her]," and "she was always very stressed." SW also testified that her father would try to make their time together during visitation fun but that her father and JW would frequently get into fights "about things that [did] [not] make sense." She further testified about incidents in which she saw her father chase JW down a hill and spank him with a belt and "grab[] [JW]'s face with his hands and . . . h[o]ld it real tight." SW also explained, however, that there have

8

been fewer incidents since the court ordered supervised visitation because her aunt or grandmother "[had] always been there" and "stopped it if he got too serious."

SW also testified that she now loves living in Jonesboro, where she resides with Amy, JW, and her maternal grandmother. She explained that her new school is fun and that she had made a new friend. SW also said that Amy has never put her hands on JW, choosing instead to send him to another room so "he can just be by himself and just calm down."

Amy also testified about Mark's irregular habits, explaining that he had an "extremely" unusual sleep pattern during their marriage. According to Amy, he would regularly sleep all day and would go "who knows where" at night. She testified that Mark claimed that he had gone to the office or had been bush hogging in the middle of the night at their other house in Mountain Home. In particular, she described one incident in which Mark used a neighbor's tractor in the middle of the night—without permission—and damaged it. Amy further testified that she had received phone calls from at least three other women who made allegations against Mark.

Amy described other odd behavior. She testified that after she and the children began living with her brother, Richie Minton, Mark made daily appearances on Mr. Minton's property. According to Amy, "he was just there . . . waiting for me when I got home." He made one additional appearance even after Mr. Minton contacted the police, leaving Walmart bags full of items for Amy and the children at the edge of Mr. Minton's property at 3:30 in the morning.

Regarding Mark's supervised visitation, Amy testified that there were almost constant problems because they were rarely supervised in compliance with the court's temporary

order. As indicated above, the children, especially SW, became reluctant to visit their father. According to Amy, SW became very emotional about it and was afraid to go because it had become a very stressful environment where there was a lot of conflict and arguing. Both children eventually refused to go because they were anxious and "never [knew] what to expect."

Amy further testified that the children had been doing great since moving to Jonesboro. They were both making good grades in school and were involved in extracurricular activities. Amy also opined that her children were doing great emotionally and were "better than ever" and "very happy."

Richie Minton testified that he witnessed a few different events in which he saw Mark in a bad state. In one incident, Mark became disoriented and had run the battery down on his Jeep while looking for people that he alleged had been trespassing on his property. Mr. Minton testified that Mark was carrying a gun and appeared to be impaired because he was moving slowly and slurring his speech.

Mr. Minton also explained that there were a few occasions after the separation when Mark came to his house. The visits generally did not end well and left everybody upset. He described one visit that occurred before the no-contact order, in which he found Mark on his property in a disoriented state that caused him to mistake Mr. Minton for an elderly neighbor who apparently looked nothing like him. Additionally, after the no-contact order had been entered, Mr. Minton was leaving for work one morning and found a handwritten "stop" sign that Mark had propped up on water bottles at the end of his driveway. The sign was adjacent to the Walmart sacks that Amy described in her testimony.

Finally, Mr. Minton testified that he noticed a positive change in SW's and JW's demeanor after they moved to Jonesboro. He said that, in fact, the children were "thriving" and making a lot of friends in their new home.

Members of Mark's own family also questioned his fitness as a parent. Mark's sister, Stacey White, testified that she had become "very much" concerned about her brother's behavior in the two years that preceded the final hearing. She described him as "a whole different person" who slurred his speech, behaved erratically, and had become "mentally absent." She described a particular incident that occurred during Mark's first visitation with the children after the separation, which she supervised. Upon their arrival at her house, Mark donned her husband's motorcycle helmet and rode a child's tricycle, insisting that she video record his "idiotic" antics. Mark thereafter did not join SW and JW in Stacey's pool as they had originally planned but spent the rest of the afternoon recuperating from his exertion on the tricycle. Stacey reported that Mark's speech was slurred that afternoon, and "he did not spend any time with the kids."

Stacey described another incident that occurred on December 19, 2017, when a friend contacted her to pick Mark up from outside a salon where he was slurring his speech and otherwise appeared "out of it" and "unable to drive." Mark told Stacey that he had taken additional prescription medication that day, and she opined that he would have been unable to pass a sobriety test or care for his children in that condition.

Dr. Bruce White—Stacey's husband—testified he had noticed a decline in Mark's overall functional status in the last few years, when Mark had begun moving slowly and slurring his speech. Dr. White also described the incident that occurred outside the salon.

He accompanied his wife to the scene, where they found Mark slumped over the steering wheel of his truck and "a little groggy." Mark was not "completely conscious of things" and "demanded to have his keys back," although it was obvious that he could not pass a field sobriety test. Dr. White further testified that Mark admitted he had taken additional prescription medication before receiving a massage at the salon.

The circuit court was also a first-hand witness to Mark's erratic behavior. He frequently gave long, unfocused answers during his testimony, prompting his own attorney to admonish him to focus and listen to the questions being asked. There was also an incident that the circuit court referenced in the October 30 decree in which Mark, with no apparent provocation, appeared to threaten Amy's counsel. The circuit court also reviewed exhibits showing that Mark had ranting communications with the Arkansas State Medical Board over the status of his medical license in 2015 and 2016.

The foregoing evidence, along with the attorney ad litem's recommendation that primary custody remain with Amy, demonstrates that the circuit court's custody determination was not clearly erroneous. Moreover, while Mark introduced several witnesses who testified that his behavior and ability to care for the children stabilized as his health improved after the separation—a claim that was somewhat contradicted by his behavior during the final hearing—we must defer to the circuit court's determination that their testimony did not weigh in favor of joint custody. *See Carillo*, 2019 Ark. App. 189, at 2, 575 S.W.3d at 152. Therefore, the circuit court's custody determination is affirmed.

B. Finality

Mark also argues that the circuit court's decisions regarding supervised visitation, contempt, alimony, and property division constitute reversible error. We are without jurisdiction to address these arguments, however, because with the exception of the circuit court's order awarding custody, the decrees in this case are not final, appealable orders. Several of the contempt petitions that Amy filed are still pending, and the decrees entered on October 30, 2018, and February 11, 2019, contemplate future judicial action on alimony, child support, and the division of the proceeds of an auction sale of the couple's remaining real and personal property.

The question whether an order is final and appealable is jurisdictional, and this court is obligated to consider the issue on its own even if the parties do not raise it. *Price v. Carver*, 2017 Ark. App. 75, at 2, 513 S.W.3d 877, 879. Rule 2(a)(1) of the Arkansas Rules of Appellate Procedure–Civil provides that an appeal may be taken from a final judgment or decree that is entered by a circuit court. The finality of a circuit court's judgment or decree is a jurisdictional requirement, and its purpose is to avoid piecemeal litigation. *See Roach v. Roach*, 2019 Ark. App. 34, at 5, 571 S.W.3d 487, 490. "For a [decree] to be final and appealable, it must dismiss the parties from the court, discharge them from the action, or conclude their rights to the subject matter in controversy." *Davis v. Davis*, 2016 Ark. 64, at 5, 487 S.W.3d 803, 807. It must also "put the court's directive into execution, ending the litigation or a separable part of it." *Id*. A decree that contemplates further judicial action is not final. *Roach*, 2019 Ark. App. 34, at 5, 571 S.W.3d at 490. Additionally, because "[c]ontempt is not merely

a collateral issue, like attorney's fees," a circuit court's order is not final and appealable when contempt issues remain pending. *Id*.

Here, the decree entered on October 30, 2018, set only temporary amounts of child support and alimony. Regarding child support, the circuit court found that it had not been provided "with the necessary evidence to correctly set the amount of the retroactive and present child support obligation of Dr. Williams." Accordingly, the court ordered Dr. Williams to pay a temporary monthly amount of $741.18 and held the record open until "such time as a supplemental hearing is held or stipulations are presented to the court." Similarly, the circuit court ordered Dr. Williams to pay temporary alimony of $1,000 per month and refrained from making a permanent award until it heard additional evidence "regarding Dr. Williams's income." The final awards of child support and alimony apparently remain pending, as the decree that the court entered on February 11, 2019, awards retroactive child support and alimony based only on the temporary amounts set forth in the October 30 decree.

The February decree also does not finally resolve the division of the assets remaining after an auction of the couple's real and personal property. As noted, that decree appeared to reverse the circuit court's previous ruling that equally divided the net proceeds of the sale, ruling instead that they are to be deposited into the court's registry and divided by further orders of the court.

The record also does not contain written orders demonstrating that the circuit court ruled on several petitions for contempt that Amy filed. These include a petition filed on January 24, 2017, alleging that Mark violated a previous order by appearing at visitation

14

exchanges; a petition filed on August 7, 2017, alleging that Mark violated the court's no-contact order; a petition filed on December 4, 2017, alleging that Mark disposed of personal property and failed to undergo a court-ordered mental evaluation; and finally, a petition filed February 9, 2019, alleging that Mark failed to pay child support, failed to prepare a qualified domestic relations order as the court directed in the October 30 decree, and otherwise engaged in "willful behavior." Accordingly, we dismiss the remaining issues in the appeal for lack of a final order.

IV. *Conclusion*

We affirm the custody order because the circuit court did not clearly err when it determined that it was in the best interests of the minor children to live with Amy. The remaining issues are dismissed without prejudice for lack of a final order.

Affirmed in part; dismissed in part.

VAUGHT and BROWN, JJ., agree.

*Robert S. Tschiemer*, for appellant.

*Jeremy B. Lowrey*, for appellee.