Cite as 2026 Ark. App. 199

# ARKANSAS COURT OF APPEALS
DIVISION II
No. CV-25-99

|  |  |
|---|---|
| | Opinion Delivered April 1, 2026 |
| MELISSA HENRY (SHOPTAW) | APPEAL FROM THE SALINE |
| APPELLANT | COUNTY CIRCUIT COURT |
| | [NO. 63DR-20-1034] |
| V. | |
| | HONORABLE KEN CASADY, JUDGE |
| SHAWN HENRY | |
| APPELLEE | AFFIRMED |

**BART F. VIRDEN, Judge**

Appellant Melissa Henry (now Shoptaw) appeals from the Saline County Circuit Court's order finding sufficient changed circumstances to warrant a modification of appellee Shawn Henry's visitation with the parties' minor child ("MC"). Melissa argues that the trial court erred in finding that the parties had joint custody of MC and modifying their custody agreement without requiring a material change of *her* circumstances; that even a modification of visitation requires a material change of circumstances; that a modification of Shawn's visitation was a de facto change of custody without a material change of circumstances; and that, alternatively, it was not in MC's best interest to increase Shawn's visitation. We affirm.

I. *Background*

The parties were married in July 2012; MC was born in 2016; and the parties divorced by decree entered on March 31, 2021. By agreement of the parties, the decree provides that

Melissa is the fit and proper person to have care, custody, and control of MC subject to Shawn's reasonable parenting time. The decree further provides that the parties shall share joint legal custody of MC with Melissa being the primary custodial parent. The decree expressly states that

> [j]oint custody means that before a decision is made the parties are charged with consulting one another on the issue, taking into consideration as to what is in the best interest of the child and not what is best for either party. In the event that the parties are unable to reach a mutual agreement, then [Melissa] shall have final decision-making authority. Each party will make the day-to-day decisions regarding the child while he is in that party's physical care.

The decree provides that Shawn's parenting time includes every other weekend from Friday at 6:00 p.m. until Sunday at 6:00 p.m. During the week, Shawn will have one night of visitation beginning when school recesses for the day until 7:30 p.m. The decree provides that the parties agree that the visitation night will depend on Shawn's work schedule but acknowledge that the night will fall between Tuesday and Thursday and that they will be flexible due to Shawn's work schedule. There is also a division of holidays, and Shawn is to have three weeks of summer visitation. The decree provides that regular weekend and weeknight visitation will be suspended for the summer visitation period and will resume when school begins and that, if Shawn needs childcare during his weeks in the summer, Melissa will provide that care.

On May 12, 2023, Shawn filed a "Motion to Modify Custody" alleging that Melissa frequently interferes with his visitation in that she calls MC during his visits, which upsets MC and undermines what Shawn is doing with him, and tells MC that he does not have to

2

stay with him (Shawn) and that she can come and get him (MC). Shawn also alleged that on Christmas 2022, Melissa attempted to schedule a trip during his visitation, and when he would not agree to give up his time with MC, she withdrew the extra parenting time he had been receiving. Shawn alleged that Melissa threatens to withhold visitation if he does not provide all of the transportation for visitation. Shawn further alleged that Melissa has made unfounded allegations that his fiancée, Tonya, mistreats MC and that MC is "scared of her." Shawn alleged that Melissa has unilaterally withheld visitation and that she has lied about MC being in therapy, manipulates and coaches MC into distress, and bribes MC with toys. Shawn stated that he has recently relocated to Benton in order to be closer to MC. According to Shawn, all of these facts and others constitute a material change in circumstances that justify a modification of custody. Shawn requested that he be awarded primary custody of MC, or joint and equal custody of MC, or expanded and specific visitation up to equal time with MC.

An attorney ad litem (AAL), Cynthia Moody, was appointed, and her recommendation was that the parties should continue to share joint custody of MC but that there is no need for a "primary" designation because that has not worked well. She opined that Shawn's parenting time should be increased to every Thursday overnight and that she would not oppose an equal division of time. Moody reported that "[t]he bottom line is, [MC] wants more time with his father and ultimately feels like 'the same time with each of them' would be, in his words, 'fair.'"

## II. *Hearing Testimony*

3

Shawn testified that he has been employed as a nurse anesthetist since the divorce and that he has lived in Alexander since May 2023. Shawn said that he did not see MC for three or four weeks after the decree was entered in 2021 because Melissa claimed that MC, then four years old, did not want to see him. Shawn said that he initially had trouble picking up MC from school for his midweek visitation because Melissa said that the school could not offer any additional parking passes. He said that he believed her given that she worked at the school but that he later requested and received a parking pass. Shawn said that Melissa requires that he notify her by Sunday at 9:00 p.m. which midweek night he wants for visitation with MC, and if he fails to notify her, she denies him the visit. He said that he has heard Melissa tell MC that he does not have to stay with him (Shawn) if he does not want to. Shawn testified that Melissa told him that the decree does not say anything about transportation, so she has no responsibility to transport MC for visitation.

Shawn testified that he told Melissa that Tonya, his then live-in girlfriend, would be caring for MC while he was at work during visitation and that Melissa rejected that plan and told him that she would have the police come and get MC. Shawn said that the police did come to his home that night but did not take MC. Shawn said that Melissa claimed that MC had told her that Tonya had been mean to him during visitation. Shawn said that Melissa, however, had not liked Tonya since the day they met because Tonya is not a "professional" and has tattoos. He said that Tonya is a full-time double-major student. He said that he and Tonya have been together nearly two years but that Melissa's opinion has not changed.

Shawn said that MC likes Tonya and that they have fun. He said that Melissa does not want Tonya caring for MC even now that they are married.

Shawn admitted that in July 2023, he had too much to drink and injured himself when he slipped while stepping out of a kiddie pool. He said that he had had only one drink at that time and was just clumsy. Shawn admitted that he had a problem with binge drinking and that in January 2022, he was troubled by how much he drank and went to Alcoholics Anonymous. Shawn said that he considers himself sober now. He said, however, that he has a medical marijuana card and that he takes ketamine treatments for PTSD and anxiety.

Shawn testified that Melissa recently enrolled MC in Cub Scouts but failed to tell him about it. He said that Melissa refused to join Our Family Wizard, a coparenting website and phone application, so they do not have a shared calendar. He said that Melissa generally informs him about MC's baseball games but failed to tell him about a playoff game despite the fact that he repeatedly asked when it would be. He then conceded that the baseball team had a GroupMe text thread that he was on, but he had turned off notifications. Shawn said that, when he texts or calls Melissa about MC, she does not respond for hours. He said, for example, that Melissa is aware that he is "obsessed" with outer space—MC is as well—and that he wanted time with MC during the recent eclipse. He had asked about all of them meeting at a park, but Melissa said that she did not know what they would be doing and did not respond to his texts. Shawn said that he would go several days without speaking with MC on the phone because when he would text Melissa, she would not call back until the following day when he was at work and could not answer his phone.

Shawn said that he has made adjustments to his work schedule and that he plans to work as a contractor, which means no more overnights or working past 3:00 p.m. Shawn also said that living closer to MC has helped him better engage with MC. He said that just expanding his time with MC would improve MC's life because there would not be as much conflict between his parents. Shawn said that the agreed order provides that his visitation is suspended during the summer and does not resume until school begins—he said that he did not intentionally agree to that. Shawn stated that Melissa limits him to just the three weeks with MC in the summer. He said that Melissa threatened to interfere with his summer visitation if he did not allow her to watch MC during spring break while he was at work.

Melissa testified that she is a special-education teacher at Bryant High School. She claimed that, between March 2021 and November 2022, Shawn exercised visitation only sporadically, never kept MC overnight, sometimes failed to show up, and called her to pick up MC early a few times, even in the middle of the night. Melissa claimed that there was a time when MC cried and begged not to have to see Shawn but that MC was better about it now that Shawn is "re-engaged." She said that the parties' agreed order could have been clearer about when she is to provide childcare for Shawn during the summer—it should have been during anytime that Shawn is working. She agreed that she had permitted Shawn to see MC during the summer for only the three weeks as stated in the decree. Melissa said that, when she has MC, her parents provide childcare for MC and pick up and drop off MC at school. Melissa admitted that, for Shawn's midweek visit, he could not pick up MC from

school because he did not have a parking pass, and he had to wait until she picked up MC from her parents—even though Shawn's visit lasts only until 7:30 p.m.

Melissa said that she initially had a problem with Tonya providing childcare but that it was only because MC had a "huge problem" with it. She said that she was disappointed that Shawn was working over Easter, conceding that it was because MC was "stuck" with Tonya when he could have been "with family"—not acknowledging that Tonya was family at that time. Melissa admitted that she had only recently accepted that stepparents are "family." Melissa insisted that she did the right thing by having the police do a welfare check on MC while he was staying with Tonya because MC did not feel safe with her. She said she was hoping that the police would remove MC from the home and allow her to take him to her home. She conceded that Shawn had been with Tonya about the same amount of time that she had been with her now husband. Melissa acknowledged that MC had claimed, in part, that Tonya was "mean" because she had given him a time-out for touching a humidifier when he had been told not to touch it. Melissa said that MC is sensitive and that Tonya's parenting style is "abrasive." Melissa testified about a time when Tonya returned MC early from visitation at Melissa's request. She said that she had interpreted Tonya's text stating "I'm here" as having been sent with a hateful tone and had told Tonya that there was no need to be passive aggressive and to be kind and that she had caused the family enough stress.

Melissa conceded that she continually reminds Shawn that she has the final say in decisions about MC. She agreed that she has withheld midweek visitation from Shawn if he fails to abide by her rule to tell her ahead of time which day he wants to visit with MC. She

said that, even though Shawn did not know he would have a particular afternoon off until that morning, she felt that it was too late to make plans for a visit. Melissa testified that she thought it would be better to have a set day for midweek visitation so that the parties did not argue about it every week. Melissa agreed that she had denied a midweek visit to Shawn just before spring break because he had not given advance notice of the day and because he would be getting an extra overnight the next week. Melissa admitted that if she allowed Shawn to pick up MC for weekend visitation after school at 3:00 instead of 6:00, she would require their Sunday exchange time to be moved up three hours. She agreed that if MC wants to spend more time with Shawn, his voice should be heard.

Melissa testified that Shawn has an alcohol addiction. She claimed that he had gone to work drunk and had to attend AA. She also claimed that Shawn smokes weed around MC. Melissa said that Shawn also struggles with his emotional health. She stated that she does not usually leave MC with her husband. She conceded that her husband also has addiction issues but that he has not had a drink in five years while Shawn continues to drink. She said, in fact, that MC had said something to make her believe that Shawn had been drunk in the last year but that she did not ask Shawn about it. Melissa testified that she and Shawn had a physical altercation after their divorce in which she was left with bruises on her legs. In response to questioning by the court, Melissa said that she did not call the police.

Tonya testified that she loves MC and that their relationship is good. She said that they laugh a lot and do activities like planting and rock climbing. She said that she has not yelled at MC and has not put him in time-out without consulting Shawn. Tonya said that

8

Shawn has struggled to have a relationship with MC because Melissa calls him names and says he is a bad parent. She testified that MC is aware that she and Melissa do not speak unless there is something negative being said.

In rebuttal, when questioned about the injuries Melissa sustained, Shawn said that Melissa had been physically abusive to him, which caused him to file for a divorce. He said that he recalled an incident before their divorce when he was creating some distance between him and Melissa, who was screaming at him, and that Melissa threw herself on the floor. Shawn conceded that he did not exercise all of his visitation with MC in the beginning because he felt defeated. Shawn said that MC did cry during overnight visitation because he was used to sleeping with Melissa at night and that he had refused to sleep with MC, aside from lying beside him until he fell asleep. Shawn denied having any mental-health issues but admitted that he had spoken with therapists. He said that he does have depression, anxiety, and PTSD. Shawn testified that he does not consider himself an alcoholic and no longer attends AA because he feels he has more of a coping issue than an alcohol issue. He said that he takes marijuana gummies for sleep before bed and that his ketamine treatments also help with any addiction issues he might have.

In its written order, the trial court found that there had not been a material change of circumstances warranting a change from joint custody with Melissa having primary custody; however, the trial court noted that the AAL had recommended more time between Shawn and MC and found that there were sufficient changed circumstances to warrant a

modification in Shawn's parenting time. The trial court further found that the modification in the division of parenting time was in MC's best interest.

The trial court found that Melissa, as primary custodian, would still have final decision-making authority after consultation and discussion. The trial court then provided that Shawn will have MC on alternating weekends beginning with school pickup on Thursday until Sunday at 6:00 p.m. and, during weeks when there is no upcoming weekend visitation, Shawn will have MC on Wednesdays from the time that school is dismissed until 7:30 p.m. The trial court divided summer recess equally between the parties with alternating week-long periods for each parent.

## III. *Standard of Review*

In reviewing child-custody cases, we consider the evidence de novo, but we will not reverse a trial court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Grayson v. Anderson*, 2023 Ark. App. 428, 675 S.W.3d 900. Whether the trial court's findings are clearly erroneous turns largely on the credibility of the witnesses, and we give special deference to the superior position of the trial court to evaluate the witnesses, their testimony, and the children's best interest. *Id.* The trial court's conclusion on a question of law, however, is given no deference on appeal. *Id.*

Arkansas law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Ingle v. Dacus*, 2020 Ark. App. 490, 611 S.W.3d 714. Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. *Id.*

The reason for requiring more stringent standards for modifications than for initial custody and visitation determinations is to promote stability and continuity in the life of the child and to discourage repeated litigation of the same issues. *Baggett v. Benight*, 2022 Ark. App. 153, 643 S.W.3d 836. The party seeking modification of a custody or visitation order has the burden of showing a material change in circumstances. *Id.*

IV. *Discussion*

A.  Joint Custody

Melissa argues that the trial court erred in finding that the parties shared joint custody of MC. She points out that the term "joint custody" was defined in the decree and applies only to decision making.[1] According to Melissa, this case is nothing like *Nalley v. Adams*, 2021 Ark. 191, 632 S.W.3d 297, in which the supreme court held that a material-change-of-circumstances analysis was not triggered because the parties shared joint custody and that the narrow issue before it was only an adjustment of parenting time.

In *Nalley*, the parents stipulated that they would share joint legal custody of their child but that the mother would be the primary caregiver. Under the shared-time portion of the order, the trial court noted that it was a two-hour drive from Jonesboro (where the father still lived) to Little Rock (where the mother had moved with the child); that the parties had agreed to joint custody but that it was "difficult to fashion a schedule so that both parties

---

[1]Arkansas Code Annotated § 9-13-101(a)(5) (Supp. 2025) defines joint custody as the approximate and reasonable equal division of time with the child by both parents individually as agreed to by the parents or as ordered by the court.

will have adequate time with the minor child"; that both parties were suitable to have custody; that the mother worked twelve-hour shifts, while the father's schedule had little flexibility; and that the mother should permit the father additional time with the child of her own accord. *Id.* at 3, 632 S.W.3d at 299. Later, the father moved to modify the custody order because he had since relocated to Little Rock where he had a more flexible work schedule and because the mother had begun refusing him any additional time with the child. In granting the father's motion, the trial court found that the only reason the parties had not been given equal time with the child in the original order was because of the distance between the parents' residences. The trial court found that there was no discernible reason why each party could not share equal time with the child now that the father had moved to Little Rock.

On review in *Nalley*, the supreme court affirmed the trial court's decision and held that the trial court was only "enforcing" its original order. *Id.* at 8, 632 S.W.3d at 302. The supreme court reasoned that the material-change-of-circumstances analysis was not triggered because, despite the language used by the parties, no actual change of custody had been sought. The supreme court ruled that no issue of "visitation" had been presented because the parties shared joint custody and that the narrow issue before it was only an adjustment of parenting time that had been previously ordered. *Id.* at 6–7, 632 S.W.3d at 301.

We agree that *Nalley* is distinguishable and somewhat limited to its facts. The trial court in *Nalley* made many factual findings explaining why the custody arrangement in that case was labeled "joint custody" even though the parties would not be able to share equal

12

time with the child. Such an arrangement—although intended—was logistically impossible at the time of the original decree. Both the trial court and the supreme court (on review) looked to the custody arrangement that had been desired from the beginning, even though the custody order set out an arrangement that clearly was not joint custody. Thus, *Nalley* instructs us to look at the state of mind or intent of the parties and the trial court at the time of the original decree or order, regardless of its express language. Here, however, there is no indication that Melissa and Shawn ever intended to share true joint custody of MC. Moreover, although the arrangement was called "joint custody," there were no factual findings to explain why the parties were not receiving equal parenting time as there were in *Nalley*. Indeed, the term "joint custody" is defined in these parties' agreed decree and has nothing whatsoever to do with equal parenting time with MC; rather, it involves only decision-making authority. Also, unlike *Nalley*, there is no evidence that a true joint-custody arrangement was logistically impossible at the time of the original decree.

This case is more akin to *Stewart v. Stewart*, 2025 Ark. App. 97, in which the parents shared "joint custody" of their four children with the mother being the primary physical custodian subject to the father's every-other-weekend visitation. Later, the father filed a motion for a reallocation of parenting time. The trial court denied the father's request, which it noted was essentially a reallocation to reflect true joint custody. The trial court, however, found no material change of circumstances to warrant a modification of custody. In affirming the trial court's decision, we pointed out the lack of any defined terms in the parties' agreed order and said that we would be elevating form over substance to simply

13

accept the "joint custody" label when the mother clearly had primary custody subject to the father's standard visitation. We looked to the parties' testimony about what they intended as well as their conduct. The testimony in that case was clear that equal parenting time was not contemplated, and we noted that, despite the fact that the father lived within thirty minutes of the children, he had them only every other weekend. We concluded that the parties did not share joint custody and further held that the trial court did not clearly err in denying the father's motion on finding that he failed to prove a material change of circumstances had occurred since entry of the agreed order.

Here, looking beyond the label on the parties' custody arrangement, we agree that the parties did not share joint custody of MC—Melissa had primary physical custody subject to Shawn's visitation. We also agree that *Nalley* is distinguishable. Despite the joint-custody label and discussion of *Nalley*, the trial court nevertheless found that Shawn had not proved a material change in circumstances and thus refused to modify custody. We cannot say that the trial court clearly erred in reaching this decision.

B.  Modification of Visitation Requires a Material Change of Circumstances

Citing *Baggett*, *supra*, Melissa argues that a party seeking to modify visitation has the same burden as a party seeking to modify custody: the moving party must show a material change of circumstances. Melissa argues that the trial court specifically found that no material change had been shown. Melissa argues that the trial court erred in changing custody, visitation, or parenting time without requiring a material change in *her* circumstances.

14

The trial court specifically found that there was not a material change of circumstances to warrant a change of custody but ruled that there were sufficient changed circumstances to warrant a change in visitation. Both require a change in circumstances, but the analysis is not the same. In *Harris v. Tarvin*, 246 Ark. 690, 439 S.W.2d 653 (1969), our supreme court rejected an argument that visitation cannot be modified unless there is a sufficient change in circumstances to warrant a change of custody. The supreme court explained that visitation rights may be modified upon a proper showing that it is a change to which the petitioning parent is reasonably entitled because of changed circumstances *pertinent to visitation* and also that the welfare and best interest of the child dictate a change. *See also Martin v. Scharbor*, 95 Ark. App. 52, 233 S.W.3d 689 (2006). Important factors the court considers in determining reasonable visitation are the wishes of the child, the capacity of the party desiring visitation to supervise and care for the child, problems of transportation and prior conduct in abusing visitation, the work schedule or stability of the parties, and the relationship with siblings and other relatives. *Parsons v. Griffin*, 2024 Ark. App. 90, 686 S.W.3d 8. Fixing visitation rights is a matter that lies within the sound discretion of the trial court. *Id.*

Melissa argues that any change had to relate to her circumstances, but she is incorrect; the changed circumstances must simply be pertinent to visitation. *Harris*, *supra*. Shawn described how Melissa interfered with his visitation with MC, and it was apparent that Melissa exercised little flexibility, especially with regard to Shawn's midweek visitation, despite the language of the parties' agreed order that she be flexible because of Shawn's work

15

schedule. Also, there are MC's wishes to consider. AAL Moody reported that MC wanted to spend more time with Shawn, and the trial court specifically found that the increased visitation with Shawn is in MC's best interest. *See Riddick v. Harris*, 2016 Ark. App. 426, at 14, 501 S.W.3d 859, 870 (affirming trial court's increase in the father's visitation because, although trial court noted the mother's instability and "voice[d] its displeasure" with the mother's efforts to curtail and control the father's visitation, the increase in visitation was clearly based on the trial court's finding that the modification was in the child's best interest). We hold that the trial court did not err or otherwise abuse its discretion in modifying visitation.

### C. Modification of Visitation was de Facto Change of Custody

Melissa argues that the trial court's modification of Shawn's visitation with MC was a de facto change of custody without a material change of circumstances. Melissa cites *Heileman v. Cahoon*, 2024 Ark. 164, 699 S.W.3d 85, for the proposition that a modification in joint custody that is a significant decrease in one parent's time requires a material change of circumstances, and she argues that the opposite must be true: a significant increase in the noncustodial parent's visitation to the detriment of the custodial parent must require a material change of circumstances. Melissa contends that the trial court's modification of Shawn's visitation essentially changed custody from her being primary custodian to the parties sharing joint custody.

In *Heileman*, a joint-custody case, the supreme court reversed a trial court's modification decision that decreased the father's parenting time from fifty percent to about

16

twenty-six percent because the modification essentially eliminated the parties' joint-custody arrangement, which is presumed to be in a child's best interest. *Heileman*'s holding was limited to a modification decision that moved a father's parenting time *away* from joint custody, while the court's modification decision here moved Shawn's visitation/parenting time *closer to* joint custody. We disagree, however, that the trial court's order increasing Shawn's visitation resulted in a de facto change of custody because the modification decision did not even approach an award of equal parenting time to Shawn. We cannot say that the trial court erred in its decision to increase Shawn's visitation after finding sufficient changed circumstances pertinent to visitation.

D. Alternatively, Modification of Visitation Was Not in MC's Best Interest

Finally, we address what the appellate courts routinely say is the paramount consideration in custody cases—the best interest of the child. There are no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as those involving minor children. *Reynolds v. Reynolds*, 2024 Ark. App. 229, 687 S.W.3d 584.

Melissa argues, alternatively, that the trial court's modification of Shawn's visitation was not in MC's best interest. She points to Shawn's use of marijuana and alcohol during visitation with MC and asserts that he has committed acts of domestic violence against her in MC's presence.

The trial court included in the appealed order that Shawn is not to use alcohol when he has MC. Moreover, the parties' testimony conflicted regarding whether MC was present

during any domestic violence between the parties, and Melissa admitted during questioning by the court that she had not filed a police report regarding any alleged domestic abuse. It is not clear whether the trial court believed the allegations that both Melissa and Shawn leveled against each other, but the trial court made no findings concerning domestic violence or Shawn's use of marijuana gummies at bedtime. In any event, AAL Moody recommended increased visitation for Shawn because MC wanted to spend more time with him. Melissa herself testified that MC's voice should be heard with respect to whether he wanted more time with Shawn. The trial court specifically found that the new visitation schedule with increased visitation for Shawn is in MC's best interest, and we cannot say that the trial court clearly erred with regard to this finding.

As a final word, we hope that parties and trial courts will heed the warnings from our supreme court in *Heileman*, *supra*:

> Litigants, lawyers, and circuit courts alike need to understand the weight an initial custody determination is given—whether agreed on by the parties or litigated before the court. And when circuit courts are adjusting parenting time, they should be cognizant of the terminology they use and pay attention to whether an adjustment in schedule might turn into a de facto change in custody.

*Heileman*, 2024 Ark. 164, at 9, 699 S.W.3d at 90. While we do not find that a de facto change of custody occurred here, the cautionary language in *Heileman* is warranted.

It cannot be denied that the current law on custody and visitation is in a state of flux and some confusion. One consideration could greatly help all those concerned. The Arkansas Legislature has made it clear that not only is joint custody presumed to be in the best interest of a child, it has also defined the term. Courts and parties should not use the

term joint custody if the division of parenting time does not meet the definition. Doing so will greatly reduce the need for the appellate courts to divine a litigant's or a trial court's intention, especially when it is contrary to the written words in the decree or order.

Affirmed.

HARRISON and BARRETT, JJ., agree.

*Don Spears*, for appellant.

*Robertson, Oswalt & Nony*, by: *Chris Oswalt*, for appellee.