Cite as 2026 Ark. App. 340

# ARKANSAS COURT OF APPEALS
## DIVISION III
### No. CV-25-671

| | |
|---|---|
| JADE ASHLEY CENTER (NOW TANKERSLEY) | Opinion Delivered May 20, 2026 |
| APPELLANT | APPEAL FROM THE OUACHITA COUNTY CIRCUIT COURT [NO. 52DR-23-13] |
| V. | |
| KENDRA RENEA CENTER | HONORABLE RYAN PHILLIPS, JUDGE |
| APPELLEE | AFFIRMED |

## WENDY SCHOLTENS WOOD, Judge

Jade Tankersley (Jade) appeals a custody and visitation order of the Ouachita County Circuit Court regarding Minor Child (MC) (DOB 07/27/21), who was born during Jade's marriage to Kendra Center (Kendra). Jade raises four points on appeal. The first is that the circuit court's order includes clearly erroneous findings, and the second is that the circuit court clearly erred in issuing a custody order that materially modified the parties' initial custodial roles. Jade also argues two points in her challenge to the circuit court's denial of her motion for new trial: the court wrongly concluded that the parties had not filed the schedule for possession, and it awarded custody without all the necessary parties. We affirm.

I. *Facts*

Jade and Kendra married in October 2019. MC, who was conceived through artificial insemination, was born on July 27, 2021. Both parties are identified as parents on MC's birth certificate—Jade as "MOTHER" and Kendra as "PARENT II." On January 10, 2023, Jade filed a pro se complaint for divorce, which stated that the parties had "voluntarily entered into a verified Marital Settlement Agreement, dated the 19th day of November, 2022 . . . . [that] provides for the settlement of all of the issues related to their marriage, including support, custody, and parenting time for their minor child[.]" The marital settlement agreement is actually a document titled "PROPERTY SETTLEMENT AGREEMENT" (PSA). One month later, on February 21, 2023, the circuit court entered an agreed divorce decree that incorporated and merged the PSA into the decree by reference. Relevant sections of the PSA parenting plan provides the following:

**VII. PARENTING PLAN:**

**JOINT LEGAL CUSTODY WITH PRIMARY PHYSICAL CUSTODY:**

**Jade Ashley Center and Kendra Renea Center shall each share jointly the legal custody and care of our minor child(ren) with Jade Ashley Center to have the primary physical custody of [MC].**

. . . .

**Jade Ashley Center shall be the primary custodial parent for [MC].** The primary custodial parent shall have sole right to establish the primary residence and further shall have the following exclusive rights and duties to: the power to consent to the marriage, to medical, dental, and surgical treatment involving invasive procedures, and to psychiatric and psychological treatment; the power to represent the child(ren) in legal action and make other decisions of substantial legal significance concerning the child(ren), except when a guardian of the child's estate or a guardian or attorney ad litem has been appointed for the child(ren), a power as an agent of the

child(ren) to act in relations to the child's estate if the child(ren)'s action is required by a state, the United States, or a foreign government.

   **Kendra Renea Center, as the non-custodial parent shall have the right to physical possession of the child(ren), <u>AT ALL TIMES MUTUALLY AGREED</u>** upon by the parties and failing agreement, at such specific times and places as are set forth in the attached Schedule for Possession of Minor Children which is incorporated herein for all purposes by this reference.[1]

(Emphasis in original.) The schedule for possession referenced in the PSA provides:

### SCHEDULE FOR POSSESSION OF MINOR CHILDREN

MUTUAL AGREEMENT: The parents may have possession of the child(ren) at any and all times mutually agreed to in advance, and in the absence of mutual agreement, shall have possession of the child(ren) under the specified terms set out below.

MC will primarily live with Jade Center. Kendra Center will be able to pick MC up at any time as long as it was discussed beforehand. We will switch off weekends with MC. The holidays will be spent together/split both parents will discuss beforehand. We will have joint custody with the understanding that if an issue arises with our agreement we will come back to court for a different visitation plan.

Neither party was represented by counsel at the time of the divorce.

On March 14, 2025, Jade filed a motion to modify alleging that, according to the parties' PSA, she is the primary custodial parent of MC, and Kendra is the noncustodial parent. Jade alleged that Kendra had disrupted Jade's custody and had frustrated Jade's ability to coparent, which is against MC's best interest. Jade alleged that this constituted a material change of circumstances and requested that the court "enter a detailed visitation order." Jade also sought permission to relocate with MC.

---

[1]The full text of the PSA's parenting plan is attached to the opinion as Appendix I.

In response, Kendra stated that, despite the parties' designated custodial roles in the PSA, they had engaged in a joint-custody arrangement because they shared custody of MC on a "week-on/week-off basis," which Kendra maintained was in MC's best interest. Kendra also filed a counterclaim asking the court to enter an order of joint custody consistent with what the parties had been doing in practice.

A hearing took place on July 1, 2025, just before MC's fourth birthday. In opening remarks, Jade's counsel stated that the schedule for possession was what had led the parties to court. Counsel further stated that the issue he intended to present "will be how to address the difficulties the parties have had with the possession schedule to hopefully provide more clarity[.]" Kendra's counsel agreed that the parties' "schedule" is "very sparse" and "does not follow anything." Kendra's counsel argued that because there is joint-custody language in the PSA, the court can use a parenting-time approach. Kendra's counsel conceded that, pursuant to the PSA, Jade had the right to relocate with MC.

Jade testified that she had taught in the Smackover School District in Union County. After her divorce from Kendra, Jade married Elizabeth Tankersley in March 2023, and they have a son together. Jade said that their son and MC are full siblings because she (Jade) is their mother and they have the same biological father. In May 2025, Jade and Elizabeth, along with their son and MC, moved to Miller County after Jade obtained a higher-paying teaching position in Texarkana.

The court asked Jade's counsel if there was a concern that the biological father may still have some rights with respect to MC. Jade's counsel responded, "There's not that

4

contention," but "[t]here's that concern . . . because there's never been a termination and adoption." The court allowed "a thin line of questioning" to be sure "we have the necessary parties." Jade testified that "there was never a termination [of the father's parental rights] and an adoption" of MC by Kendra.

Jade explained that she and Kendra initially worked together to set Kendra's days for "possession" of MC. Jade said that there was no set visitation schedule at first, and Kendra started with Wednesday and every other weekend and could pick up MC at any time if they agreed. Jade agreed that there was a period when the schedule was two days one week, three days in another, plus days when Kendra would pick up MC for additional time. Jade testified that the parties had alternated weeks of "possession" of MC for the past year. But Jade stated that the alternating-week schedule was not a "true agreement" because she was faced with "emotional pressure" to accommodate Kendra and to eliminate conflict. Jade said there was no mutual agreement and that the PSA said the parties would go to court in the event of a disagreement. Jade asked for a standard visitation schedule.

Elizabeth, Jade's wife, had observed Jade and Kendra trying to work through the possession schedule but said that it was "never good enough" for Kendra. Elizabeth acknowledged that, at her insistence, the parties alternated weeks of "possession" of MC for a year because it was best for MC.

Kendra testified that she lives and teaches in Camden and is married to Karrie Center. Kendra said that Jade prepared the divorce documents and that they did not consult an attorney. She said that they agreed to joint legal custody with Jade being the primary physical

5

custodian. Kendra said she was told that someone had to be listed as the primary physical custodian and that she would not have signed the PSA if she had known that it meant her time with MC would be limited.

Kendra said MC was eighteen months old at the time of the divorce, and they started with a visitation arrangement of every Wednesday night and every other weekend but that she occasionally requested and received additional time. Kendra said that they later came up with a "two/two/three" arrangement where they each had MC 50 percent of the time. Kendra said that after about a year of the "two/two/three" arrangement, they went to alternating weeks for a year until Jade texted her that they were reverting to the PSA, and Kendra would get visitation on Wednesdays and every other weekend. Kendra asked for "joint physical custody on a school calendar versus a non-school calendar visitation schedule."

Karrie Center, Kendra's wife, testified that the parties had alternated weeks of "possession" of MC from March 2024 to March 2025 and that she thought it was best for MC to spend as much time with each of her parents in large blocks of time. MC's preschool teacher testified that it was best for MC to spend large blocks of time with her parents.

At the close of the case, the circuit court said that Jade and Kendra are both good, capable parents, which is great for MC but made its job very difficult. The court said that it did not begrudge either party for being in court because the parties' PSA had a "zero point zero percent chance of working out . . . . It was an impossibility." The court issued an oral

temporary order directing the parties to alternate weeks of "possession" of MC until it issued a final order.

On July 8, Jade filed a posttrial brief asserting that Kendra had not established a material change of circumstances and asked for "legal custody" of MC subject to Kendra's rights under a visitation schedule in MC's best interest. Jade also asserted that Kendra was a "step-parent and former domestic partner" and not entitled to joint custody of MC because it would be a violation of the biological father's due-process rights.

On July 21, the circuit court entered a custody and visitation order ("July 21 order") finding that no material change of circumstances had occurred. The court also found that the parties' current custody agreement remained in effect, which awarded the parties joint legal custody[2] of MC, designated Jade the primary physical custodian, and set a visitation schedule for Kendra. Specific to visitation, the court noted that the parties had exercised alternating weeks of "possession" of MC for one year; both parties are fit and proper to have the "care, custody and possession" of MC; each party should enjoy as much time with MC as practical; and MC is in preschool and has a flexible schedule. The court found that until MC begins kindergarten, the parties will alternate "possession" of her on a weekly basis.

---

[2]Although the circuit court initially states that the parties will share "joint custody," this is a scrivener's error. The circuit court had just found that there was no material change of circumstances warranting a change in custody and that the "current custody orders"—the PSA and schedule for possession—shall remain in effect. The court later in the order defined "joint legal custody" for the parties. The facts in this case are undisputed that the parties initially agreed to "joint legal custody" of MC with Jade being the primary physical custodian and Kendra being the noncustodial parent entitled to visitation.

Once MC begins kindergarten, Kendra will have "possession/visitation" during the school year every other weekend and during Thanksgiving, Christmas, and spring and summer breaks. Jade will have "possession" every other weekend in the summer and a five-day summer vacation. The court also authorized Jade's relocation to Texarkana.[3]

On August 4, Jade filed a motion for new trial pursuant to Rules 59 and 60 of the Arkansas Rules of Civil Procedure, arguing that the circuit court mistakenly found that the "schedule for possession was not filed" and, thus, that the court set the visitation schedule in a manner significantly different from the PSA. The motion also asserted that the court failed to follow the standard visitation guidelines. Finally, Jade argued that the court failed to address the biological father's parental rights. The motion included a July 18 acknowledgement of paternity executed by both Jade and Julian Cheatham.

On August 5, Cheatham filed a motion for intervention alleging that he is MC's biological father, that he lived with the parties for about six months after MC's birth, and that MC knows him as "daddy." Cheatham also asserted that he was at the July 1 hearing and wanted to testify but was not given the opportunity to do so. He stated that the testimony at the hearing showed he had not abandoned his parental role or relinquished his rights. He claimed that he had a strong showing of entitlement to intervene and that he has a legally recognized interest in the proceedings because he is MC's biological and putative father and

---

[3]The circuit court's relevant "findings and orders" are attached to the opinion as Appendix II.

8

has constitutional rights to the care, custody, and control of MC, which the July 21 order did not address.

On August 20, Jade filed a notice of appeal from the July 21 order. On August 26, the circuit court denied Jade's motion for new trial as well as Cheatham's motion for intervention. Jade filed an amended notice of appeal on September 2, appealing from the July 21 order and the denial of the motion for new trial.[4]

## II. *Standard of Review*

Child-custody cases are reviewed de novo on appeal, but we will not reverse a circuit court's findings of fact unless they are clearly erroneous. *Carrillo v. Morales Ibarra*, 2019 Ark. App. 189, at 1, 575 S.W.3d 151, 152. A finding of fact is clearly erroneous if, after reviewing all the evidence, the appellate court is left with a definite and firm conviction that a mistake has been made. *Id.* at 1–2, 575 S.W.3d at 152. Whether a circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses; therefore, we give special deference to the circuit court's superior position to evaluate the witnesses, their testimony, and the child's best interest. *Id.* at 2, 575 S.W.3d at 152. There are no cases in which the circuit court's superior position, ability, and opportunity to observe the parties carry as great a weight as those involving minor children. *Id.* at 2, 575 S.W.3d at 152. The primary

---

[4]Cheatham filed a notice of appeal from the order denying his motion to intervene. This is the subject of a separate appeal, *Cheatham v. Center*, 2026 Ark. App. 310, ___ S.W.3d ___, also handed down today.

consideration in child-custody cases is the welfare and best interest of the child; all other considerations are secondary. *Id.* at 2, 575 S.W.3d at 152.

III. *Points on Appeal*

A. The July 21 Order Includes Findings That Are Clearly
Against the Preponderance of the Evidence

Jade argues the July 21 order includes findings that are clearly erroneous because they are "based on the [circuit court's] false premise that no Schedule for Possession was in effect." She claims that the court found that the schedule for possession was not filed or that the court failed to locate it. Jade argues that because the court believed that the schedule for possession was not in effect or could not be located, the court did not consider the schedule for possession, which led the court to erroneously conclude that the visitation schedule agreed to by the parties in the divorce decree was alternating weeks. This argument misreads the circuit court's July 21 order and is without merit.

The circuit court's order stated: "The [PSA] noted a "Schedule for Possession" attached to the [PSA], yet no such schedule was attached." Our review of the record confirms this. Therefore, the court did not clearly err.[5]

B. The Circuit Court Clearly Erred in Issuing the July 21 Order Because It
Materially Modifies the Parties' Initial Custody Roles

---

[5]Moreover, the record is clear that the court considered the substance of the schedule for possession. The schedule for possession followed a "UCCJA compliance" document that was filed on the same day the PSA was filed. The schedule for possession was discussed by the parties at the hearing. In fact, counsel for both parties stated in their opening remarks that they were in court because of the language in the schedule for possession, which provided: "[I]f an issue arises with our agreement we will come back to court for a different visitation plan."

1. *The July 21 order removes the exclusive rights and duties previously granted to Jade*

Jade argues that the circuit court's definition of "joint legal custody" abrogates her rights as MC's primary physical custodian expressly given to her in the PSA. We disagree.

As set forth in the PSA, as primary physical custodian, Jade was given the right to establish MC's primary residence along with

> the power to consent to the marriage, to medical, dental, and surgical treatment involving invasive procedures, and to psychiatric and psychological treatment; the power to represent the child(ren) in legal action and make other decisions of substantial legal significance concerning the child(ren), except when a guardian of the child's estate or a guardian or attorney ad litem has been appointed for the child(ren), a power as an agent of the child(ren) to act in relations to the child's estate if the child(ren)'s action is required by a state, the United States, or a foreign government.

None of Jade's "exclusive rights and duties" as the primary physical custodian were changed by the July 21 order. Moreover, Jade does not explain which of these "exclusive rights and duties" were in any way impaired by the court's July 21 order other than stating that the court ordered the parties to confer with respect to "all major decisions affecting the welfare of [MC]" and allowed both parties to obtain both emergent and nonemergent medical care. But in the PSA, the parties were required to confer on all "important matters concerning, health, education, and welfare" of MC, and both parties had the right to obtain medical care, with the exception of invasive procedures, and the power to consent to medical treatment during an emergency.

Thus, the circuit court's definition of "joint legal custody" merely clarified the joint legal custody they already agreed to in their PSA. Additionally, the physical custodial roles

11

the parties agreed to—Jade as primary physical custodian and Kendra as noncustodial parent with the right to visitation—remained unchanged. As found by the circuit court, neither party had demonstrated a material change of circumstances, and the "current custody orders shall remain in effect wherein the parties share joint [legal] custody of the minor child with [Jade] being the primary physical custodian[.]"

2. *The July 21 order substantially modifies the parties' agreed visitation, is a de facto change of custody, and disregards Jade's role as primary physical custodian*

Jade contends that the visitation the parties agreed to was "every other weekend, split holidays (or spent together), plus other times mutually agreed upon" and that the circuit court's July 21 order substantially modified that agreement, resulting in a de facto change of custody. She contends that the terms of the order are inconsistent with the court's finding that she is the primary physical custodian and vary from the court's standard visitation guidelines, which she asserts are consistent with the parties' agreement.

As already explained, nothing in the July 21 order modified the parties' visitation agreement substantially or in any way inconsistent with Jade's role as the primary physical custodial parent. The circuit court found that there was no material change of circumstances and expressly stated that "the current custody orders shall remain in effect wherein the parties share joint [legal] custody of the minor child with [Jade] being the primary physical custodian." There was no change of custody in this case.

The court did set a visitation schedule for Kendra. This was necessary because the visitation schedule the parties agreed to in the PSA was merely an agreement to agree, with

12

no actual schedule. For example, Kendra, as the noncustodial parent, had "the right to physical possession of [MC] AT ALL TIMES MUTUALLY AGREED upon by the parties." If the parties could not agree, then her visitation was set forth in the schedule for possession. The schedule for possession was redundant and internally inconsistent because it also provided that MC will live primarily with Jade, but Kendra "will be able to pick [MC] up at any time as long as it was discussed beforehand. We will switch off weekends with [MC]. The holidays will be spent together/split . . . ." The schedule for possession concludes with: "We will have joint custody with the understanding that if an issue arises with our agreement we will come back to court for a different visitation plan." In sum, the parties agreed to mutually agree on visitation, and if they could not, they would return to court for a different visitation plan. There was no visitation schedule.[6]

The circuit court's July 21 order set a visitation schedule, which is precisely what Jade asked for in her motion to modify and in hearing testimony. Jade's true complaint is that she does not like the visitation schedule set by the court. She asserts that the schedule for possession that includes the alternating weekend and the "spent together/split" holidays language should control, noting that it is more consistent with the circuit court's standard-visitation guidelines. And she argues that the order disregards both parties' testimony about

---

[6]Counsel for both parties agreed at the onset of the hearing that they were there because the schedule for possession failed to provide a visitation schedule. At the conclusion of the hearing, the circuit court aptly noted that the parties' agreement to agree without a schedule had "a zero point zero percent chance of working out" until MC's eighteenth birthday and that the parties would be back in court.

MC's best interest because the court ordered the parties to continue the alternating-week visitations until MC reaches kindergarten age, elaborating that the visits included homes and schools in different cities during what Jade characterizes as MC's "crucial pre-kindergarten academic year."

Although Jade requested that the circuit court employ its standard visitation schedule for Kendra's visitation, Kendra requested as much visitation as possible. Acknowledging that Jade and MC now live in Texarkana and MC would be starting school soon, Kendra requested that the court set a school-calendar/non-school-calendar visitation schedule.

Ultimately, the circuit court's July 21 order found that the parties would alternate weeks of "possession" of MC until she started kindergarten. Once MC starts kindergarten, Kendra will have "possession" during the school year every other weekend and during Thanksgiving, Christmas, and spring and summer breaks, and Jade will have "possession" every other weekend in the summer and for a five-day summer vacation.

We have held that the primary consideration regarding visitation is the best interest of the child, and fixing visitation rights is a matter that lies within the sound discretion of the circuit court. *Kinder v. Kinder*, 2022 Ark. App. 476, at 11, 655 S.W.3d 880, 887. We have also held that child-visitation decisions will not be overturned unless clearly erroneous. *Id.* at 11, 665 S.W.3d at 887.

The court was tasked with setting a structured visitation schedule that was in MC's best interest. In making its decision, the court considered that the parties had previously

14

exercised alternating weeks of "possession" for a year.[7] The record reflects that Jade agreed to alternating weeks of "possession" with Kendra for a year, and the circuit court noted that Jade had difficulty "pointing to a specific issue that caused her to deviate from the alternating weeks of possession." Jade's wife, Elizabeth, testified that she had insisted at one point that the parties alternate weeks with MC because she thought it was best for MC. There was also testimony from Kendra's wife, Karrie, and MC's preschool teacher that it was best for MC to spend larger blocks of time with her parents.

The court also considered the fitness of Jade and Kendra. At the hearing, the court stated that MC was lucky because she had two "very good and capable parents." The circuit court found in its order that both parties are fit and proper to have care, custody, and "possession" of MC, and the court believed that each party should have as much time with MC as is "practical" to help foster their relationships. Significantly, the record reflects that MC was thriving. The court also found in its order that MC was "well-adjusted and excelling in her development."

Finally, the circuit court's visitation schedule considered MC's age and her and Jade's relocation to Texarkana. The court determined that because MC was not yet in kindergarten, there was additional flexibility in the visitation schedule. Accordingly, the court found that it was in MC's best interest that Jade and Kendra continue alternating weeks of "possession" until MC reached kindergarten. However, once MC started kindergarten, the court adjusted

---

[7]The evidence at the hearing also showed that the parties shared equal time with MC the year prior to that when they employed the "two/two/three" visitation schedule.

15

the visitation plan so that MC would remain primarily with Jade during the school year, while Kendra would have "possession" of MC every other weekend during the school year and during her school breaks. In light of this evidence and our standard of review, we hold that the circuit court did not clearly err in creating this structured visitation schedule and in finding that it is in MC's best interest.[8]

C. The Circuit Court Abused Its Discretion in Denying the Motion for New Trial

Jade's third and fourth points on appeal challenge the denial of her motion for new trial. Motions for new trial are governed by Arkansas Rule of Civil Procedure 59, which specifically enumerates the grounds for granting a motion for new trial. Ark. R. Civ. P. 59(a) (2025). Jade's brief in support of her motion for new trial asserted these grounds: "irregularity of proceedings, errors of law and fact, and those errors contained in the July 21 order."[9] The circuit court summarily denied Jade's motion.

---

[8]Under the circumstances of this case, the parties did not agree to a visitation schedule, which is why Jade asked the circuit court to set a structured visitation schedule. Even assuming the parties did agree to a schedule, there were changed circumstances pertinent to visitation that dictated a change. *See Henry v. Henry*, 2026 Ark. App. 199, at 15. The changed circumstances pertinent to visitation included (1) the parties' alternate-week visitation for the past year and the "two/two/three" visitation schedule the year before that, (2) Jade's and MC's relocation to Texarkana, (3) the flexibility of the visitation schedule while MC was in preschool, and (4) MC's upcoming kindergarten year. These circumstances along with the other circumstances set forth above support the best-interest and welfare analysis also required to modify visitation. *Id.*

[9]Jade alternatively moved for new trial pursuant to Arkansas Rule of Civil Procedure 60, asking the circuit court to amend the July 21 order to reflect the biological father's parental rights and to conform with Jade's role as primary physical custodian. However, on appeal, Jade has abandoned her request-for-new-trial relief under Rule 60.

16

It is well settled that a motion for new trial is left to the sound discretion of the circuit court, and the circuit court's refusal to grant it will not be reversed on appeal unless an abuse of discretion is shown. *Elder v. Elder*, 2020 Ark. App. 283, at 4. An abuse of discretion means a discretion improvidently exercised, i.e., exercised thoughtlessly and without due consideration. *Id.*

Jade first argues that the circuit court abused its discretion in denying the motion for new trial after being made aware that the circuit court's order incorrectly stated that the schedule for possession was not attached to the PSA and that the terms of the schedule for possession were materially different from those in the July 21 order. This argument restates the one made in her first point on appeal. As already explained, this premise has no merit. Therefore, we hold that the circuit court did not abuse its discretion in denying the motion for new trial on this basis.

Second, Jade argues that the circuit court abused its discretion in denying her motion for new trial because the court awarded custody without all necessary parties. Citing *Abeyta v. Abeyta*, 2013 Ark. App. 726, at 4, which reversed and remanded an order awarding custody of the child to her stepmother and visitation to the child's biological father because the circuit court failed to require the joinder of the child's biological mother as an indispensable party, Jade contends that biological parents are necessary parties to custody proceedings. She argues that the court was made aware at the hearing that the parental rights of MC's biological father—Cheatham—had not been terminated, and she points out that she and Cheatham filed an acknowledgment of paternity on July 18, 2025. She concludes that

17

despite this knowledge and information, the circuit court's July 21 order fails to address Cheatham's paternity or parental rights. She claims that this was an irregularity in the proceedings warranting a new trial. *See* Ark. R. Civ. P. 59(a)(1).

Jade's argument is mistakenly premised on the acknowledgment of paternity that she and Cheatham filed after the hearing that she claims constitutes "a conclusive finding of paternity." Arkansas Code Annotated section 9-10-120 (Repl. 2020) provides in part that a "man is the father of a child for all intents and purposes if he and the mother execute an acknowledgment of paternity of the child pursuant to § 20-18-408 or § 20-18-409, or a similar acknowledgment executed during the child's minority." This statutory presumption including section 20-18-408, refers only to an affidavit acknowledging paternity executed by "a woman who was unmarried at the time of either conception or birth or between conception and birth." Ark. Code Ann. § 20-18-408 (Repl. 2018). MC was born during the parties' marriage, and Jade has cited no statutory authority establishing that an acknowledgment of paternity's "conclusive finding of paternity" would apply in this situation. Because Jade has failed to establish that Cheatham is MC's biological father, *Abeyta* does not apply, and she has failed to establish that Cheatham was a necessary party in this matter.

Moreover, a party moving for new trial on the basis of Rule 59(a)(1) must show that his or her rights have been materially affected by demonstrating a reasonable possibility of prejudice. *Bulsara v. Watkins*, 2012 Ark. 108, at 11, 387 S.W.3d 165, 172. Jade has not shown

that her rights have been materially affected because she failed to demonstrate the possibility of prejudice from the July 21 order.

For these reasons, we cannot say the circuit court abused its discretion in denying Jade's motion for new trial.

IV. *Conclusion*

In sum, we affirm the circuit court's June 21 order and the order denying Jade's motion for new trial.

Affirmed.

KLAPPENBACH, C.J., and TUCKER, J., agree.

*Appellate Solutions, PLLC*, d/b/a *Riordan Law Firm*, by: *Deborah Truby Riordan*, for appellant.

*Thomas Law Firm, PLLC*, by: *F. Mattison Thomas III*, for appellee.

APPENDIX I

RELEVANT EXCERPTS OF PROPERTY SETTLEMENT AGREEMENT
PARENTING PLAN


**VII. PARENTING PLAN:**

**JOINT LEGAL CUSTODY WITH PRIMARY PHYSICAL CUSTODY:**

**Jade Ashley Center and Kendra Renea Center shall each share jointly the legal custody and care of our minor child(ren) with Jade Ashley Center to have the primary physical custody of [MC].** Our parenting relationship shall be guided by the following terms and conditions:

**Both parents shall have all the rights and duties of a parent <u>at all times</u>**, including: the right to receive information from the other parent concerning the health, education and welfare of the child(ren); to confer with the other parent to the extent possible before making decisions concerning the health, education and welfare of the child(ren); of access to medical, dental, psychological and educational records of the child(ren); to consult with a physician, dentist or psychologist of the child(ren); the right to consult with school officials concerning the child(ren)'s welfare and educational status, including school activities; the right to attend school activities; the right to be designated on any records as a person to be notified in case of an emergency; and the right to manage the estate of the child to the extent the estate has been created by the parent or the parent's family.

**Both Parents shall confer with each other on all important matters concerning the health, education and welfare of the child(ren).** If matters arise that they are unable to agree upon, the issue shall be submitted to a professional for dispute resolution or arbitration.

**Both will encourage a positive relationship between the child(ren) and the other parent.**

**Both Parents shall share jointly the following rights, duties, privileges, and powers <u>at all times</u>,** including; to direct the moral and religious training of the child(ren) during periods of possession; the duty of care, control, protection and reasonable discipline of the child(ren), including providing the child(ren) with clothing, food, shelter, and medical and dental care not involving an invasive procedure; and the power to consent to medical, dental and surgical treatment during

an emergency involving an immediate danger to the health and safety of the child(ren).

**Jade Ashley Center shall be the primary custodial parent for [MC].** The primary custodial parent shall have sole right to establish the primary residence and further shall have the following exclusive rights and duties to: the power to consent to the marriage, to medical, dental, and surgical treatment involving invasive procedures, and to psychiatric and psychological treatment; the power to represent the child(ren) in legal action and make other decisions of substantial legal significance concerning the child(ren), except when a guardian of the child's estate or a guardian or attorney ad litem has been appointed for the child(ren), a power as an agent of the child(ren) to act in relations to the child's estate if the child(ren)'s action is required by a state, the United States, or a foreign government.

**Kendra Renea Center, as the non-custodial parent shall have the right to physical possession of the child(ren), <u>AT ALL TIMES MUTUALLY AGREED</u>** upon by the parties and failing agreement, at such specific times and places as are set forth in the attached Schedule for Possession of Minor Children which is incorporated herein for all purposes by this reference.

APPENDIX II

RELEVANT EXCERPTS OF JULY 21 ORDER

FINDINGS AND ORDERS

. . . .

18. Neither party hereto has shown that a material change in circumstances has occurred; therefore, the current custody orders shall remain in effect wherein the parties share joint [legal] custody of the minor child with the Plaintiff being the primary physical custodian.

19. The Court believes, as do the parties, that their respective rights with respect to the minor child and the periods of possession need to be specifically addressed as the parties have not been able to agree regarding periods of possession/visitation.

20. The parties had previously exercised alternating weeks of possession with respect to the minor child. Although there appears to have been some disagreement as to that arrangement on the part of the Plaintiff, the alternating weeks of possession occurred for approximately one year. The Plaintiff had difficulty in pointing to a specific issue that caused her to deviate from the alternating weeks of possession.

21. Both parties are fit and proper to have the care, custody and possession of the minor child and the Court believes that each party should enjoy as much time with the minor child as is practical to help foster their relationship.

22. The minor child is not yet of sufficient age to attend kindergarten, which provides additional flexibility regarding periods of visitation/possession of the child until she reaches the age when she will begin formal schooling.

23. Joint legal custody is hereby defined and ordered as follows:[10]

---

[10]The court described eleven circumstances where the parties shared joint legal custody of MC, including but not limited to, both being placed on MC's school mailing lists; both being listed on MC's school, extracurricular, and school records and forms; both being authorized to attend MC's extracurricular activities; both having full access to all information regarding MC; and both being entitled to authorize emergency medical treatment for MC.

. . .

24. Until the minor child begins kindergarten, the parties shall alternate possession of the child on a weekly basis (Friday at 6:00 p.m. to the following Friday at 6:00 p.m.).

25. The Plaintiff shall have the right to designate the minor child's residence and where the minor child will attend school.

26. Once the child begins kindergarten, the Defendant shall have possession/visitation as follows:

a) During the school year, on the 1st and 3rd weekends of each month from Friday at 6:00p.m. through Sunday at 6:00 p.m.

b) Friday at 6:00 p.m. immediately preceding Labor Day through 6:00 p.m. on Labor Day.

c) The day school dismisses for Thanksgiving Break at 6:00 p.m. through the day before school resumes at 6:00 p.m.

d) The day school dismisses for Christmas/New Year break at 6:00 p.m. through the day before school resumes from the Christmas/New Year break at 6:00 p.m.; however, the Plaintiff shall have possession of the minor child in even numbered years from December 23rd at 6:00 p.m. through December 26th at 6:00 p.m. and December 30th at 6:00 p.m. through January 2nd at 6:00 p.m. in odd numbered years.

e) The day school dismisses for Spring Break at 6:00 p.m. through the day before school resumes at 6:00 p.m.

f) The day school dismisses for Summer at 6:00 p.m. through three (3) days before school resumes at 6:00 p.m.; however, the Plaintiff shall have the right to every other weekend visitation during the Summer Break and shall be able to designate five (5) days for vacation with the minor child during the summer, with the Plaintiff notifying the Defendant of the vacation date in writing on or before March 15th of each year.

g) Modifications to this schedule can be made by the parties; **HOWEVER, ANY SUCH MODIFICATIONS SHALL BE AGREED TO BY THE PARTIES IN WRITING.**

23

27. The Plaintiff of the minor child shall have possession of the minor child at all other times not specifically granted to the Defendant in the preceding paragraph.

28. All exchanges involving the minor child shall occur at the Dollar General in Stamps, Arkansas (which is where the exchanges have been occurring) and can be made by any responsible, licensed adult authorized by either party. If an individual other than the Plaintiff or Defendant is going to pick up or drop off the minor child, then notice must be provided to the other party identifying the individual who will be providing the transportation.